UNITED STATES

v.

Kevin M. HOLT, 519 06 3308, Lance Corporal (E–3), U.S. Marine Corps.

NMCM 94 02003.

U.S. Navy–Marine Corps
Court of Criminal Appeals.

Sentence Adjudged 23 June 1994.

Decided 17 June 1997.

Dan R. Hyatt, Civilian Defense Counsel.

LT Syed N. Ahmad, JAGC, USNR, Appellate Defense Counsel.

LT David M. Harrison, JAGC, USNR, Appellate Government Counsel.

Before McLAUGHLIN, SEFTON and WYNNE, Appellate Military Judges.

SEFTON, Judge:

Appellant was convicted, contrary to his pleas, by a court consisting of officer and enlisted members, of conspiracy to commit larceny, premeditated murder in the stabbing death of a fellow Marine, Corporal Brent Arthurs; and larceny of a trailer, motorcycle, and various motorcycling apparel in violation of Articles 81, 118, and 121, Uniform Code of Military Justice, 10 U.S.C. §§ 881 918, and 921 (1994) [hereinafter UCMJ]. Referred as a capital-murder case, the trial proceedings spanned the period between 14 September 1992 and 17 March 1993. Appellant was represented by both individual military counsel and detailed counsel at all sessions of the trial. Each of appellant's counsel professionally represented him throughout the proceeding. Following a hard-fought trial on the merits, appellant was convicted as charged, and sentenced to a dishonorable discharge, reduction to pay grade E–1, forfeiture of all pay and allowances, and confinement for life. The convening authority approved the sentence as adjudged.

We have examined the record of trial, the eight assignments of error,[1] the Govern-

---

1. I. EVIDENCE OF LUMINOL TESTING OF APPELLANT'S PANTS WAS ERRONEOUSLY ADMITTED AGAINST APPELLANT WHERE SUCH EVIDENCE DID NOT COMPLY WITH *DAUBERT V. MERRELL DOW PHARMS., INC.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

II. EVIDENCE OF LUMINOL TESTING OF APPELLANT'S PANTS WAS ERRONEOUSLY ADMITTED AGAINST APPELLANT WHERE THE PREJUDICIAL EFFECT OF SUCH EVIDENCE FAR OUTWEIGHED ANY PROBATIVE VALUE. (Citation omitted.)

ment's response thereto, and appellant's reply to the Government's response. We have also heard extensive and enlightening oral argument by counsel for appellant and the Government. Based upon our careful consideration of these matters, we conclude that the findings and sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant was committed. We will discuss each of the assigned errors in turn, after first providing our ruling on the collateral matter of appellant's petition for a new trial under Article 73, UCMJ, 10 U.S.C. § 873, and RULE FOR COURTS-MARTIAL 1210, MANUAL FOR COURTS-MARTIAL, UNITED STATES (1995 ed.) [hereinafter R.C.M.].

### The Petition for a New Trial

Based on our resolution of the matters raised by appellant in his briefs and in oral argument before this court, and following our careful consideration of the entire record of proceedings and allied papers, appellant's request for a new trial under Article 73, UCMJ, 10 U.S.C. § 873 is without merit, and is therefore denied. Because of the extreme seriousness of the charged misconduct of which appellant stands convicted, and the resultant sentence to life imprisonment, we have interpreted as generously as possible those materials submitted in support of appellant's arguments, despite the objection in the brief by Government counsel. Those matters included an even more detailed attack on the credibility of Mr. Rod Englert, the Government's blood-spatter analyst, than was mustered at trial. We are mindful of the caution exercised by our Air Force brethren in the area of post-trial evidentiary considerations, and concur in their basic reasoning. *United States v. Toro*, 34 M.J. 506, 521 (A.F.C.M.R.1991), *aff'd on other grounds*, 37 M.J. 313 (C.M.A.1993) (where the Air Force Court declined to permit supplementation of the record to further contest the credibility of the witnesses at trial), but we specifically find that no fraud upon the court has been demonstrated. Even if the materials proffered by appellant during the appellate process had been available to the triers of fact below, they would not have "probably produce[d] a substantially more favorable result for the accused," and we likewise find that the fraud now alleged is not demonstrated as likely to have had "a substantial contributing effect on a finding of guilty" of the premeditated murder charge. R.C.M. 1210(f)(2)(C), (3). *See also Toro*, 34 M.J. at 521.

We find that the great breadth of litigation emphasis on the luminol testing of the jeans does not by its bulk make it critical to the findings of guilty at issue here. That testing forms but a minuscule part of the case against appellant, a case which we find staggering in its scope and depth. Seldom do we find an accused in possession of goods belonging to a recently deceased person in circumstances similar to those found in this case. Appellant was riding the decedent's prized motorcycle, wearing the decedent's equally prized leather riding suit and helmet—which the decedent was not known to have willingly loaned to others. Appellant emerges, through the testimony of several

III. EVIDENCE THAT APPELLANT'S PANTS CONTAINED HUMAN BLOOD WAS ERRONEOUSLY ADMITTED AGAINST APPELLANT WHERE THERE WAS NO CONNECTION SHOWN BETWEEN THE BLOOD ON THE PANTS AND APPELLANT OR THE VICTIM. (Citation omitted.)

IV. APPELLANT WAS DENIED CONSTITUTIONAL DUE PROCESS OF LAW WHERE GOVERNMENT AGENTS DESTROYED THE POTENTIALLY EXCULPATORY VALUE OF EVIDENCE BY ADULTERATING THAT EVIDENCE DURING TESTING DESPITE A DEFENSE *GARRIES* REQUEST.

V. THIS COURT SHOULD ORDER A DUBAY HEARING TO ALLOW THE DEVELOPMENT OF EVIDENCE WHICH IS ESSENTIAL TO A CONCLUSION THAT APPELLANT'S COURT MARTIAL WAS TAINTED BY FRAUD, AND THAT APPELLANT'S PANTS CONTAINED EXCULPATORY VALUE WHICH WAS DEGRADED OR DESTROYED BY GOVERNMENT AGENTS.

VI. THE EVIDENCE WAS FACTUALLY INSUFFICIENT TO SUPPORT APPELLANT'S CONVICTION OF MURDER.

VII. THE ARTICLE 32 INVESTIGATING OFFICER DEPARTED FROM HIS ROLE OF IMPARTIALITY BY RECOMMENDING TO TRIAL COUNSEL THAT HE HAVE EVIDENCE SEIZED FROM APPELLANT RE-TESTED BY GOVERNMENT WITNESS ENGLERT.

VII[I]. THE MILITARY JUDGE ERRED IN REFUSING TO SUPPRESS STATEMENTS MADE BY APPELLANT AFTER APPELLANT HAD REQUESTED COUNSEL. (FOOTNOTE OMITTED.)

witnesses of varying strengths and relationships to the overall picture, as an unrepentant murderer of an acquaintance who enjoyed recounting the act of homicide. In fact, he pointed out to more than one person that the jeans which form the center of the luminol controversy were worn by him as he killed Corporal Arthurs. While we feel compelled to deal *seriatim* with appellant's assignments of error, we are not moved by his attempts to shift our focus through a straw to ignore the larger realities of the evidence presented at trial against him.

### The Luminol Evidence (Assignments I and II)

■ The Government, in its case-in-chief, proffered the testimony of Mr. Rod Englert as an expert in the area of blood-spatter pattern analysis. Additionally, R.A. Grimsbo, Ph.D., testified concerning his forensic analysis of the jeans seized from appellant and purportedly worn during the murder of Corporal Arthurs, Prosecution Exhibit 9 (hereinafter "jeans"), in conjunction with a request by Mr. Englert. The controversy in this regard centers on their joint use of luminol[2] as the method of enhancing the visibility of otherwise invisible blood in order to attempt to determine if there was a telltale spatter pattern. Appellant contends before us both that luminol is not a widely accepted scientific process, and that spatters enhanced with luminol cannot form an appropriate basis for blood-spatter analysis. He is mistaken and, in fact, his theories fly in the face of evidence the defense team adduced at trial.

The defense expert, Mr. V. Parker Bell, who had extensive background and credentials in blood-spatter analysis, testified at length concerning luminol testing. Among his comments were support for the long-standing use of the procedure, first noted by him in 1968–69 while at college; the fact that he has used the procedure in "hundreds" of tests over the years; and that it is most useful where blood is not visible, perhaps in an instance where a crime laboratory has already reviewed the evidence using an alternative light source and detected nothing. Record at 2474.[3] Mr. Bell reviewed the luminoled jeans, photographed during their testing by Englert and Grimsbo, and responded affirmatively to questions regarding whether they could be "consistent with a person wearing those jeans who had been in proximity to a stabbing," or whether they could be consistent with a great number of other things. Record at 2485. This nearly echoes the conclusions of the Government experts which appellant now decries.

We first note our agreement with the Government that appellant's attempt to rely on an appellate attack on the scientific reliability of luminol as a presumptive test for the presence of blood comes late. At trial he offered no objection to the testimony of Government witnesses on the scientific reliability of luminol and, indeed, as we illustrate in detail below, offered his own witnesses who supported the widespread use and acceptance of the technique he now questions. Whether we characterize the state of the case as a waiver or as a forfeiture under the analysis mandated by *United States v. Olano*, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), our conclusion is the same: as part of his trial strategy, appellant intentionally declined to object to the scientific basis for luminol use at trial. Since we find no error in the proceedings below, and certainly no "plain error" of constitutional dimension, no relief is warranted. *See generally Olano*, 507 U.S. 725, 113 S.Ct. 1770; Art. 59(a),

---

2. Luminol is a compound 3 aminophthalhydraide (5–amino 2,3–dihydrophthalazine 1, 4 dione), which was first synthesized in the early twentieth century. · It's name, luminol, means "producer of light," which aptly describes what occurs if it is sprayed, in a reagent mixture, on areas where occult blood (among other substances) is present. The areas glow with a blue light for 10–15 minutes following spraying, and are generally photographed with time-lapse photography to record the reaction. R.R.J. Crispino, *Luminol and the Crime Scene*, THE PROSECUTOR,

Summer, 1991, at 30 n. 6 and sources cited therein; *see also* Record at 2212.

3. CWO3 Mills, associated with the United States Army Criminal Investigative Laboratory (ISA-CIL) was also called as a defense witness. He likewise testified that luminol is an acceptable and accurate presumptive test for locating blood stains. Record at 2240, 2258. Ms. Carol Hunter, the defense criminologist, also testified that she used luminol on the jeans, and noted a positive reaction on 27 spots. *Id.* at 3031.

UCMJ, 10 U.S.C. § 859(a). Our rationale is explained in the analysis below.

No one testified that proximity to a stabbing was the sole possible source of blood on appellant's jeans, but all testified that the patterns on the jeans were "consistent with" such an event. Even CWO3 Mills, who appeared for the defense below, could not state that the spatter pattern in question could not have been from a stabbing. Record at 2223. We note as well that the defense expert, Mr. Bell, referring to the jeans, spoke in terms of "different events to cause the blood to get on there." Record at 2485. He likewise acknowledged that the luminol-enhanced photographs (Prosecution Exhibits 12—14) were consistent with what the Government expert earlier stated. In particular, he did not dispute the conclusions that the pocket *may* have had a bloody hand inserted in it; the right leg *may* have been in proximity to a stabbing, and that "classical blood spatter patterns" were possibly viewable. *Id.* at 2487–88. Mr. Bell clarified his testimony on redirect examination by stating: "I'm saying that we cannot say that it is inconsistent with any other theory.... We would include a stabbing within the field of consistent possibilities...." Record at 2528.

Further, the defense expert "criminalist," Ms. Carol Hunter, testified at length concerning her own use of luminol on the jeans, with results generally consistent with those attained by Dr. Grimsbo. *Id.* at 3028–52.[4] She also testified that the positive results obtained by both she and Dr. Grimsbo with luminol were only "presumptive" for the presence of blood, and that an actual determination that blood was present could be made only following a "confirmatory" test. *Id.* at 3046.

We are therefore unable to ascertain a rational basis of support for the great weight

accorded by appellant to the possible "false positive" associated with luminol. Luminol was accepted by all experts who appeared at trial, and the scientific community as a whole, as a viable, routinely used, and extremely sensitive "presumptive" test for the presence of blood. In this case, not only luminol, but also a second testing process using phenolphthalein, another accepted test for the presence of blood, demonstrated a presumptive presence which corroborated the luminol findings in question by appellant. Record at 2173–75; PAUL C. GIANNELLI & EDWARD J. IMWINKELRIED, SCIENTIFIC EVIDENCE, VOLUME 1, 532 (2d ed.1993). Beyond the fact that these two presumptive tests indicated the likely presence of blood, the record reflects statements by appellant which also corroborate that fact. Record at 1078 (testimony of Private Sprenger) and 1290–92 (testimony of Lance Corporal Sheldon).

Were the positive luminol and phenolphthalein presumptive tests alone in evidence, perhaps appellant's argument would be more persuasive. Unfortunately for appellant's position, one of the commonly accepted confirmatory tests, the "crossover electrophoresis" test, was done by Dr. Grimsbo, and it ultimately determined human blood to be present on the jeans. Dr. Grimsbo was, however, unable to *further* specify the type, or match it to a particular human source. *Id.* at 2173–75. *See also* GIANNELLI & IMWINKELRIED, *supra,* at 533–35 (stating that electrophoresis is an accepted confirmatory test, and further indicating that qualified expert testimony that blood is from a human source is generally judicially admissible). We note also that CWO3 Mills, called by the defense in its case-in-chief, also indicated that the crossover electrophoresis test is a valid and widely accepted confirmatory test for the presence of human blood. Record at 2235–36.

---

4. The following dialogue between Ms Hunter and the trial counsel occurred during cross-examination:

"Q: Now, luminol is a screening test for blood?
A: Yes.
Q: And it was positive on these jeans?
A: Yes.
Q: Luminol is a scientifically valid investigatory tool; is that correct?

A: That's correct, yes.
Q: And competent and reasonable forensic scientists would use luminol in situations such as these jeans, where there's [sic] no visible stains; is that true?
A: Well, actually, there are some stains that are visible on the jeans; but yes, they use them in cases where it's not visible...."
Record at 3045–46. (emphasis added).

We remain convinced that even absent *any* luminol evidence from appellant or the Government—sufficient foundational bases for the admissibility of the jeans are evident under appropriate analyses under MIL. R. EVID. 401–403, MANUAL FOR COURTS-MARTIAL, UNITED STATES (1995 ed.). We likewise find no *destruction* of the jeans to any significant extent which precluded appellant's experts from either appropriate review of Government testing or independent testing in their own right. If that were to be found, it would trigger relief under the theory propounded by appellant arising from the dicta found in *United States v. Garries*, 22 M.J. 288, 293 n. 6 (C.M.A.1986). We concur in the military judge's considered resolution of these issues below based on our own independent analysis of the evidence, and find no basis in fact or law to exclude the evidence of luminol testing.

We are not faced with the same dilemma which confronted the court in *United States v. Nimmer*, 43 M.J. 252 (1995), as it contemplated the effect of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), on admissibility of the testing of a hair follicle for evidence of cocaine use as a matter of scientific evidence in military cases—a novel scientific issue. *See also United States v. St. Jean*, 45 M.J. 435, 444 (1996), *and United States v. Youngberg*, 43 M.J. 379 (1995).

*Daubert* is interpreted by our superior court as a refinement on its earlier pronouncement in *United States v. Gipson*, 24 M.J. 246 (C.M.A.1987), that the older *Frye* Rule of admissibility of scientific evidence was supplanted in favor of a determination of "scientific validity" as the measure of evidentiary reliability. *Nimmer*, 43 M.J. at 256–57. *See Frye v. United States*, 54 App. D.C. 46, 293 F. 1013 (1923).

Luminol testing is simply not a new or novel scientific evidentiary process, and has been accepted by the single military appellate court to consider it—even under a post-*Daubert* analysis. *United States v. Hill*, 41 M.J. 596, 600–01 (Army Ct.Crim.App.1994). We believe that the trial judge in this instance performed a correct analysis under the Military Rules of Evidence and the existing precedent of our superior court. To adopt appellant's suggestion that *Nimmer* requires an automatic reversal for consideration under *Daubert* criteria seems beyond the pale of reason. We believe, as the Air Force Court of Criminal Appeals recently said, that: "[T]he judge's first responsibility is to filter from the triers of fact 'junk science.' " *United States v. Bush*, 44 M.J. 646, 651–52 (A.F.Ct.Crim.App.1996)(concerning a *Daubert* analysis of a similar issue to that confronting the *Nimmer* court). We believe the trial judge effectively performed this function, and upon review find his actions should remain undisturbed.

Although we understand that *Nimmer* mandates a remand in those cases still in the appellate chain where a novel scientific evidentiary situation was encountered at trial, we find that the military judge applied the appropriate balancing under MIL. R. EVID. 401–403 in admitting the testimony. There was simply nothing novel involved here. Notwithstanding our firm belief in the rulings below, we are also cognizant of the fact that appellant never once questioned the validity of the luminol process as a scientific process. He shall not now be heard to complain of a failure to apply *Daubert* from the position he now occupies.

We understand that appellant questions specifically the use of luminol as a basis for Mr. Englert's blood-spatter analysis, but find no evidence that would support the exclusion of that testimony since both presumptive tests and the confirmatory test mentioned above indicated the presence of human blood in the areas tested on the jeans. While the defense experts couched their opinions differently, and much effort was devoted to the true terminal velocity of blood droplets, we find no logical disconnect in considering the evidence presented by Mr. Englert. He was qualified only as a blood-spatter expert, and did not cross the line into analysis of the nature of the substance highlighted by luminol. He was also corroborated by the testing and testimony of the "criminalists," and despite all that may have been said about him, Mr. Englert's unquestioned background and qualifications in the area about which he testified remain. In short, no showing of

novelty in the scientific evidence being offered was made, and no more stringent analysis by the trial court was mandated or appropriate. We believe the upshot of Mr. Englert's testimony to be as the Government proffered in its reply brief to this court: "Englert's testimony, reduced to its simplest terms, was that the results of his test and analysis of spots on appellant's jeans was consistent with appellant's statement that he stabbed Arthurs to death. Englert's testimony was circumstantial evidence that tended to corroborate appellant's admissions." Government Brief at 9–10 n. 7. By admissions, we mean both his actions in showing the jeans to two different persons, and his statements made during questioning.

■ We further note that blood-spatter analysis is admissible scientific evidence in military jurisprudence. *United States v. Mustafa*, 22 M.J. 165, 168 (C.M.A.1986). Thus, if the *Mustafa* admissibility criteria are met, the only remaining issue is that of the weight given the evidence, not its admissibility.

Even assuming, *arguendo*, an element of novelty in this instance, we find no utility in a remand on this matter for a further evidentiary hearing and rulings of law. The blood-spatter analysis in question was but a small part of an overwhelming array of physical and other evidence establishing appellant's guilt of the premeditated murder[5] beyond a reasonable doubt, and both it and the luminol testing served only to corroborate a small portion of appellant's several admissions of guilt. *See, e.g.*, Record at 1291 (Lcpl Sheldon's testimony about being shown what became of the jeans, along with appellant's statements that he had killed Arthurs and that the pants had his blood on them).

■ We are ultimately convinced that the admission of the luminol test results here, and the subsequent use of them to form the basis of Mr. Englert's blood-spatter analysis was not error. Further, even if error in the admission is found, any such error is harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17

L.Ed.2d 705 (1967); *see also United States v. Miller*, 46 M.J. 63 (1997)(harmless error in the context of an indecent acts case). The luminol issue is, as we have stated earlier, only a very small part of a very large body of overwhelming evidence of guilt.

### The Nexus Between Prosecution Exhibit 9 and Appellant (Assignment III)

■ Appellant asserts that the Government failed to prove a nexus between him and the jeans ultimately introduced at trial as P.E. 9. First, we believe appellant's untimely assertions of the lack of a nexus to him are inconsistent with the posture of the case before us. He offered no objection when the military judge offered him the opportunity to do so early in the proceedings when the exhibit was identified and authenticated by Private Sprenger. Record at 1079; *see also* MIL. R. EVID. 103(a)(1). The evidence clearly supports the fact that these pants were seized with appellant's consent as one of more than 40 evidentiary items at the home of his relatives in the State of Washington contemporaneous with his arrest. Second, when admitted at trial, evidence was also presented that appellant had stated they were the jeans he wore at the time of the murder of Corporal Arthurs. *Id.* at 1078. The jeans corroborated this testimony, and, accordingly, need not be independently admissible. *See* MIL. R. EVID. 104(a), 304(g); *United States v. Duvall*, 44 M.J. 501 (A.F.Ct. Crim.App.1996). Thus, even if we did not determine any objection to their relevance was waived, we find that sufficient foundational relevance—both legal and factual—existed to sustain their admission as evidence in this case. Appellant's strategy of attempting to demonstrate that the jeans from which he could not dissociate himself might have somehow been contaminated simply fails. The assigned error is without merit.

### Destruction of Evidence by Agents of the Government (Assignments IV and V)

■ A significant amount of time and effort at both the trial and on appeal has been

---

5. Appellant does not appear to question his convictions on the other offenses before this court. We find each of them, as well, supported by legal and competent evidence beyond a reasonable doubt based upon our own independent analysis under Article 66, UCMJ, 10 U.S.C. § 866.

devoted to what appellant terms the *"Garries"* issues. *United States v. Garries* 22 M.J. 288, 293 at n. 6 (C.M.A.1986). The controversy here centers not on the holding in *Garries*, but on the content of footnote 6 to the opinion regarding a future situation in which the testing in question had been done in a military laboratory without notice to the defense. *See* Appellate Exhibit LXXXI. During the pendency of testing by the United States Army Criminal Investigative Laboratory (USACIL), trial defense counsel notified the USACIL that evidence should neither be completely consumed nor destroyed by testing without the opportunity either for a defense expert to participate in the testing, or the segregation of enough of the sample involved to permit independent defense evaluation. Counsel for appellant did not provide this notification to trial counsel or any other command official when it was submitted to the USACIL.[6] USACIL testing of all proffered items seized from appellant yielded no scientific evidence (though we note that different testing procedures were used there than were later used by the Government and defense experts, as discussed below).

Following the negative evaluation of the jeans for evidence of blood in the fabric by the USACIL, and during the actual trial proceedings, the Government submitted the exhibit for further testing, accomplished by Dr. Grimsbo. Dr. Grimsbo found human blood in the fabric of the jeans. In the opinion of Mr. Englert, the spatter patterns evident on the jeans *were consistent with* blood spatters and with a stabbing event. Dr. Grimsbo testified that he found evidence of human blood, but could not confirm the type as being either that of the victim or appellant. Record at 2175.

The testing done by Dr. Grimsbo differed from that done by the USACIL, in that he used luminol testing to luminesce the clothing,[7] and recorded the results with time-lapse photography, which was also made part of the Record. Prosecution Exhibits 12, 13, and 14. Record at 2171–75. This differed from the USACIL testing, which consisted of visual observation of the clothing and subjection of it to an "alternative light source."[8] Record at 2210–11. No chemical or microscopic screening tests were performed by USACIL personnel, and no obvious stains were noted then. *Id.* at 2234, 2243–44. CWO3 Mills indicated, in response to a question by Trial Counsel, that his testimony was "based entirely" on his confidence in the alternative light source "revealing the presence of all types of body fluid." *Id.* at 2249.

■ Luminoling of material can establish unequivocally that no blood is present. GIANNELLI & IMWINKELRIED, *supra*, at 532. The test is based on the catalytic activity of the heme in hemoglobin, which triggers an oxidation reaction leading to a color change. *Id.;* Record at 2475 (testimony by the defense expert, v. Parker Bell). Luminol is one of the most common tests of this type. *Id.* Once the "presumptive" presence of blood is indicated, the next step in determining the actual nature of the substance is through use of a "confirmatory" test to discern whether the substance is actually blood, and, if so, human blood in particular. Professors Giannelli and Imwinkelried indicate that among the most popular methods is the "Takayama" crystal test, which is based on a reaction between the crystal and the heme portion of the red blood cell. *Id.* at 533. The crystal confirmatory tests are less sensitive than the catalytic tests, but are more specific—with

---

**6.** While we can point to no specific requirement for notification of Government counsel under such circumstances, we commend the logic of such notification to defense counsel, in the hope that, as officers of the court, they can appreciate the fact that such notification is "in the interests of justice" overall.

**7.** Luminol, as described in an earlier footnote, is considered a "presumptive" test for the presence of blood—that is a test which determines only that blood (human or animal) *may* be present,

and which must be confirmed as to whether, if blood, it is human or animal, by other testing. Luminol is one of several screening or "presumptive" tests which are currently widely accepted and are in use in the forensic science community. GIANNELLI & IMWINKELRIED, *supra*, at 532.

**8.** The "alternative light source" is essentially a laser light source to highlight the presence of any foreign substance not otherwise visible to the naked eye under normal light conditions.

false positive not generally encountered. *Id.* These authors further observe that testimony from medical technologists "about preliminary ["presumptive"] tests, confirmatory tests, *or a combination of such tests* ... is routinely admissible." *Id.* (Emphasis added).

We are left with the fact that, for whatever reason, appellant's trial defense counsel chose not to notify the prosecution team of their *Garries* request to the USACIL, which might leave open the question of induced or invited error. *United States v. Grunden,* 2 M.J. 116, 124–25 (C.M.A.1977). We find this lack of notice to be irrelevant to our resolution of this matter, however, since we conclude that the testing by Dr. Grimsbo did not destroy or degrade the available evidentiary materials in the jeans to any significant extent. The defense expert, Ms. Hunter, testified that she was able to test the jeans, and that, in fact, she got positive reactions for blood on the exhibit. Her testimony was far less convoluted to us as it appears to have been to appellant, in that she testified not that the luminol testing had either destroyed or significantly altered the substances on the jeans, but that her "control" testing gave results which did not permit her to make a positive identification of any specific description of the blood found by her. Further, and in our opinion of greater importance, is the fact that luminol testing has been shown to have no effect on a subsequent phenophtalein test such as the one noted as the later confirmatory testing procedure used in this case. Dale. L. Laux, M.S., *Effects of Luminol on the Subsequent Analysis of Bloodstains,* 36 J. FORENSIC SCI. 1512, 1513 (1991).

We are struck by the fact that the evil sought to be remedied in *Garries* situations is the consumption of destructible evidence without sufficient opportunity for independent defense expert evaluation. Even assuming, *arguendo,* some degradation from the luminol testing as it relates to further defense-sponsored testing, the contemporaneous recordation of the luminescence through photography—which remained available at all times for independent evaluation by defense experts—appears to detract from any claim that an adequate opportunity for scientific evaluation by the defense was fore-

closed. Appellant's expert was provided the jeans, and was able to test the results proffered by Government experts and evaluate their recorded previous test results as well. Both Government and defense expert evidence was admitted as matters of legal relevance, and both were considered by the trier-of-fact in arriving at their conclusions. Appellant seemed to argue at trial that *Garries* requires a lock-step process of notice to the defense, the failure of which will invalidate any subsequent testing, even where no harm befell the evidence or the defense was not otherwise disadvantaged. Record at 1452–56; *Garries,* 22 M.J. at 290–93. We are unwilling to impose such a rule.

### Factual Insufficiency of Evidence on the Premeditated Murder Charge (Assignment VI)

In exercising our statutory obligation under Article 66(c), UCMJ, 10 U.S.C. § 866(c), we are convinced of appellant's guilt beyond a reasonable doubt on not only the premeditated murder charge, but also on all other charges before the court. We arrive at our conclusion by testing both the legal and factual sufficiency of the evidence.

The test for legal sufficiency is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner,* 25 M.J. 324 (C.M.A.1987) (citing *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). When applying this test we are "bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. McGinty,* 38 M.J. 131, 132 (C.M.A.1993)(quoting *United States v. Blocker,* 32 M.J. 281, 284 (C.M.A.1991)). In appellant's case, we so find.

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, the members of ... [this court] are themselves convinced of the accused's guilt beyond a reasonable doubt." *Turner,* 25 M.J. at 325. We are.

### The Actions of the Investigating Officer (Assignment VII)

■ We are deeply concerned by the actions of Major N., who served as the Article 32, UCMJ, 10 U.S.C. § 832 pretrial investigating officer, following the issuance of his report and the referral of the case to trial. We are cognizant that his assigned role in the case had been completed prior to the time of his dialogue with the trial counsel[9] sometime in the latter part of December, 1992. At that time, it appears from the record that he recommended to trial counsel that appellant's clothing be tested for the presence of blood by Mr. Englert. Our concern is specifically that, despite what might have been a very neutral and well-meaning motivation to provide possible resource information to assist in the case, provision of information solely to the assigned prosecutor, with no simultaneous, or even serial, notification to the defense, makes the act *appear*, at least, as one of an impermissible, adjunct trial counsel. R.C.M. 405(d); Art. 27(a)(2), UCMJ, 10 U.S.C. § 827(a)(2). We must apply a two-part test here, as articulated by the Court of Military Appeals (now the Court of Appeals for the Armed Forces) in *United States v. Payne*, 3 M.J. 354 (C.M.A.1977). We first must determine whether a departure from the statutory role occurred, and, if so, if it resulted in prejudice to appellant. *Id.* at 357. We find that the actions complained of do constitute a departure from a permissible role, and are inconsistent with the quasi-judicial obligations of the pretrial investigating officer.

■ We must next test the error for prejudice to appellant. We note that the error could not have worked any mischief in the referral process, and we are convinced beyond a reasonable doubt that no prejudice to the substantial rights of the accused arose in the trial of the case because of it. Trial counsel is not alleged to have further interacted with the pretrial investigating officer beyond the interaction described above, and we cannot speculate as to any further departure from the statutory roles of either.[10]

■ Although we find no prejudice warranting relief in this instance because of the overwhelming evidence of guilt in the record, even without any development of this issue following the discussion in question, those who act as pretrial investigating officers under Article 32, UCMJ, 10 U.S.C. § 832, would do well to ensure that they remain scrupulously attentive to the requirement that they play no subsequent role in the administration of the case.[11]

### Refusal by the Military Judge to Suppress Pretrial Statements (Assignment VIII)

■ The final assignment of error submitted to us by appellant's counsel[12] alleges error in the refusal by the military judge to suppress the pretrial statements made to Detectives Simica and Gordon of the San Diego Sheriff's Department, for all purposes, including impeachment, on the grounds that they were involuntary. While the Govern-

---

9. The Report of Investigation was completed on 4 August 1992 recommending trial by general court-martial for premeditated murder and the other offenses of which appellant was ultimately convicted. The staff judge advocate to the convening authority recommended referral as a capital case in his advice under Article 34, UCMJ, 10 U.S.C. § 834, signed on 20 August 1992, and the convening authority referred the case as capital on 21 August 1992.

10. Government Counsel proffer that this issue was waived by appellant's failure to raise it prior to entry of pleas. We decline to do so in this instance because on 22 December 1992, at the time pleas were entered, the actions here in question had either not yet taken place, or if they had taken place cannot be determined to have been within the trial defense team's spectrum of awareness. Government Brief at 30–31; Record at 205.

11. One danger in such actions which is reasonably foreseeable would be an order issued by the military judge at trial to re-open the pretrial investigation. Clearly, under the circumstances at bar here, recusal would be mandated. This situation analogizes aptly to the "Bridging the gap" cases which arose earlier in some Army cases when trial judges provided post-trial "practice pointers" to counsel prior to the cases being finalized, at times in an *ex parte* manner such as we note here occurred. *See, e.g., United States v. Copening*, 34 M.J. 28, 29 n. * (C.M.A.1992), and cases cited therein.

12. This issue is raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982).

ment's argument that the issue was waived by the failure of appellant to take the stand at trial, we will evaluate this issue of importance to appellant on its merits. *See* Government Brief at 31–32.

Our review of the evidence available on this issue leads us to several conclusions. First, we find that appellant was indeed in a "custodial interrogation" situation as defined in *Miranda–Tempia*. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *United States v. Tempia*, 16 C.M.A. 629, 37 C.M.R. 249, 1967 WL 4235 (1967). He had been arrested by two San Diego County Detectives near his mother's home in the vicinity of Seattle, Washington, and warned of his right to remain silent and to consult with an attorney. He initially spoke with the detectives, but after a break indicated a desire to speak with an attorney. The dialogue continued however, despite the mandate of the Supreme Court that it cease under these circumstances. *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

We find that, confronted with this scenario, and upon an appropriate motion *in limine* proffered by trial defense counsel, the military judge ruled that all statements taken following the request for counsel would be inadmissible in the Government's case on the merits. He concurrently ruled, as well, that the statements would be admissible as impeachment if the accused testified. We find his decision to be fully consistent with MIL. R. EVID. 304(b)(1), *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), and *United States v. Williams*, 23 M.J. 362 (C.M.A.1987). We find no evidence that the free and rational choice of appellant was somehow overborne, or that the statements in question were the product of coercion or other unlawful influence. We specifically find that the trustworthiness of the statements in question has not been brought into question. *See Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). Although we are generally inclined to give deference to the essential findings of the military judge in this area, we are not bound by them. Art. 66, UCMJ, 10 U.S.C. § 866(c); *United States v. Bubonics*, 40 M.J. 734, 738 (N.M.C.M.R.1994)(citing *United States v. Jones*, 34 M.J. 899, 905 (N.M.C.M.R.1992)). We have conducted a *de novo* review, and conclude that the military judge's trial ruling concerning admissibility of appellant's pretrial statements as impeachment evidence was correct.

Accordingly, the findings of guilty and the sentence, as approved on review below, are affirmed.

Senior Judge McLAUGHLIN and Judge WYNNE concur.