# UNITED STATES COAST GUARD COURT OF CRIMINAL APPEALS

## Washington, D.C.

## UNITED STATES

### v.

## Herbert W. MATTHEWS
### Damage Controlman First Class, U.S. Coast Guard

## CGCMG 0128

## Docket No. 1088

## 29 June 2001

General Court-Martial convened by Commander, Maintenance and Logistics Command Atlantic. Tried at Norfolk, Virginia, on 19-27 May 1997.

| | |
|---|---|
| Military Judge: | CAPT Lane McClelland, USCG |
| Trial Counsel: | LCDR Mark R. Higgins, USCG |
| Detailed Defense Counsel: | LT Heidi K. Hupp, JAGC, USN |
| Individual Military Counsel: | LCDR James A Wilson, USCG |
| Appellate Defense Counsel: | LT Frank R. Levi, USCGR |
| | CDR Jeffrey C. Good, USCG |
| Appellate Government Counsel: | LT Benes Z. Aldana, USCGR |

**BEFORE**
**PANEL FOUR**
**BAUM, KANTOR, AND WESTON**
Appellate Military Judges

WESTON, Judge:

Appellant was tried by a general court-martial, comprised of officer and enlisted members. Contrary to his pleas, he was convicted of violations of Articles 80, 93, and 134 of the Uniform Code of Military Justice (UCMJ). The Court found Appellant guilty of attempted forcible sodomy, maltreatment by sexual harassment, indecent assault, solicitation to commit sodomy, assault with the intent to commit sodomy, indecent exposure, indecent language, and an indecent act. The military judge dismissed the latter four findings as multiplicious and therefore they are not before us. Appellant was sentenced to a bad conduct discharge, reduction to pay grade E-3, and confinement for 45 days. The convening authority approved the sentence as adjudged.

Appellate Defense Counsel has assigned four errors. First, that it was error for the military judge to deny Appellant's motion for relief respecting the denial of his request for Individual Military Counsel (IMC). Second, that the military judge committed plain error by allowing a new Court member to read the transcripts of testimony presented prior to his becoming a member instead of having the testimony read to him in the presence of the other members. Third, that the military judge erred by permitting the use of suppressed evidence by the Government. Lastly, that providing the members with an evidence list that included an item not admitted into evidence constituted error. In addition, Appellate Defense Counsel has also assigned six errors on behalf of Appellant under *United States v. Grostefon*, 12 M.J. 431 (CMA 1982). Appellant alleges that his trial defense counsel was ineffective; that the Government's failure to make Defense witnesses available for the Article 32 hearing constituted error; that perjured testimony was presented by a witness for the Government; that the sentence was excessive; that Appellant did not receive a fair clemency consideration because his petition was reviewed by an officer of the same rank as—and acting in collusion with—the Staff Judge Advocate; and that the evidence was insufficient to support a conviction for attempted forcible sodomy because the only evidence against him was the accusation of the alleged victim.

We find the errors asserted on behalf of Appellant under *Grostefon* are without merit, and we see no reason to discuss them further, except to say that the alleged victim's testimony alone met the test for legal sufficiency of forcible sodomy, but fails to convince us factually, as discussed later. We discuss the remaining four assertions of error below. However, we rest our decision in this case not on any finding of legal error, but rather on our determination that the evidence offered in support of several of the offenses does not persuade us beyond a reasonable doubt that Appellant is guilty of those offenses.

## I.
## Background

At the time of trial, Appellant was a thirty-seven-year-old Coast Guardsman with an outstanding record after sixteen years on active duty. Current and former supervisors, peers, and subordinates attested to Appellant's sterling military character and his devotion to both his unit and his shipmates. In addition, since the charges alleged that Appellant had acted with force and without consent, the Defense introduced the opinions of four women who had been romantically involved with Appellant over the years, including his wife. They each testified concerning his peaceful and non-violent nature and that the acts he was claimed to have committed were not consistent with his behavior, in their experience. However, Appellant's wife admitted that she and Appellant had been involved in a minor scuffle during which Appellant had made verbal threats that he'd burn the house down if he were to find out that she was involved with another man. At the time of that altercation, and at the time of the alleged offenses, Appellant was legally separated from his wife, with whom he has two sons.

The Government's key witness was DC3 A, who claimed to be the victim of the offenses for which Appellant was convicted. DC3 A was a thirty-year-old Coast Guardsman, with prior service in the Army National Guard, who worked for Appellant at a Naval Engineering Support

Unit (NESU).  Previously, she had been assigned to a cutter, but shortly after her arrival there she became romantically involved with an E-6 member of the crew, and was voluntarily reassigned to shore duty at the NESU.  DC3 A's fiancé was a friend, and former shipmate, of the Appellant.  DC3 A's then-fiancé asked Appellant to look out for her, and DC3 A said Appellant was like a "big brother" figure to her.  (R. at 410.)  Although they did not socialize with one another, DC3 A testified that she engaged in frequent banter with Appellant and spoke candidly with him about her relationship with her fiancé and sexual matters.  DC3 A's three tattoos were another topic of at least occasional discussion between them.[1]

The record reflects that DC3 A had experienced a substantial amount of difficulty in her relatively brief career with the Coast Guard.  DC3 A was apparently reassigned from a small boat station to a ship in order to give her an opportunity to improve her knowledge of her rating and enhance her chances of advancing in grade to E-5.  However, her former Division Officer on the ship testified that she did not seem to welcome this opportunity.  This former supervisor assessed DC3 A's professional skills as deficient for an E-4 in her rating, let alone an E-5.

DC3 A had actively sought a positive recommendation for promotion to E-5 in order to realize her goal of attending Officer Candidate School, without which she could not qualify for consideration.  However, her senior supervisor at the NESU did not believe that she was ready to advance.[2]  In order to take the service-wide examination for promotion to E-5, DC3 A needed a favorable recommendation from her Command.  The prospects for gaining a favorable recommendation were uncertain at best.  However, it was also clear that Appellant would have an influential voice in that decision.

In June 1996, Appellant and DC3 A were sent on temporary duty to another state for several days in order to perform maintenance work on a Coast Guard ship located there.  During this temporary duty they stayed in a local motel.  After completing their work one afternoon, Appellant asked DC3 A if she would like a ride to the local beach.  They drove to the beach in the government truck they were using for transportation.  Once at the beach, they went their separate ways until it was time to depart.  Before returning to their motel, they had a meal together in a local beach bar.  They each had several beers with their food, and DC3 A made two telephone calls, including a call to her fiancé with whom she argued.

Afterwards, while driving back to the motel, DC3 A removed her shirt and undid her bikini top, in the process exposing her breasts to Appellant.  At trial she testified that she did so because the strings to her bikini top had gotten caught up in her shorts and she wanted to retie them.  DC3 A testified that, during the drive back to the motel, she complained about her argument with her fiancé and sought Appellant's advice.  She testified that Appellant told her that, "You just need some dick and you'll be okay."  (R. at 428.)  As they arrived at their motel,

---

[1] DC3 A's three tattoos are similar in appearance, differing mainly in coloration.  Each tattoo depicts a small salamander.  One of these tattoos is on her hip, one is on her shoulder, and one is on her pubic mound.

[2] The Commissioned Warrant Officer at the NESU testified that DC3 A "had a lot of problems with doing the job" (R. at 1004); and was "lethargic, slow-like.  When she was doing tasks it took a lot longer than normal."  (R. at 1007.)  However, he ultimately recommended her for advancement when she received orders for transfer to a new unit following the events giving rise to this case.  He explained, "I was trying to do her a favor . . . ."  (R. at 1010.)

DC3 A continued to discuss her problems with her fiancé. She testified that, once again, Appellant said, "I told you, all you needed was some dick." (R. at 431.) She testified that, in reply, she told Appellant all she wanted was a beer. She further testified that although Appellant told her he didn't have any beer in his room, she didn't believe him. She said that she followed Appellant into his room, intending to continue their conversation and to drink beer with him.

Appellant testified that during their return from the beach, he went to a store and bought beer. He related that, on the way to the store, DC3 A untied her bikini top and exposed her breasts to him. He denied telling DC3 A that she "needed some dick." After they returned to the motel and he parked the truck, he testified that he put the beer in his room and propped open the door in order to go visit with another guest at the motel.[3] Appellant testified that while he was doing this, DC3 A walked into his room. He followed her into the room to see what she was doing. He testified that when he entered the room she was standing next to his bed and, when he closed the door, she asked him if he wanted to see her tattoo. Appellant testified that he responded, "yes," and she unzipped and briefly lowered her shorts. (R. at 1236.) He then said he asked her if she wanted to see his. Appellant testified that she said, "yes," and he then exposed his penis above the top of his shorts. *Id*.

Appellant testified that DC3 A then grabbed his penis and began playing with it. At this point he said he thought that they were going to engage in sexual intercourse. When she sat on the edge of the bed and placed her mouth near to his penis, "I told her to go ahead." (R. at 1237.) Appellant said he then sat down next to DC3 A, who lay back on the bed. He got on top of her and they "bumped and grinded" with one another. (R. at 1238.) However, no penetration occurred as DC3 A was still wearing her shorts, and, after a brief time, Appellant testified that she said that she didn't want to do this, so he rolled off of her. He testified that as they lay alongside one another on the bed, DC3 A had her head on his chest and her hand in his pants. Appellant testified, "I came to my senses and told her this wasn't going to happen . . . and she rolled over on top of me and gave me a peck kiss on the mouth real hard and laughed and got up and left." *Id.*

In sharp contrast, DC3 A testified that the events in Appellant's motel room placed her in fear of her life and began when Appellant unexpectedly dropped his shorts while she was seated on his bed. She testified that she had entered his room in order to continue discussing her problems with her fiancé over a beer. She testified that she refused to believe Appellant when he claimed that he didn't have any beer in his room. When she looked over at Appellant and saw that he had dropped his shorts to his ankles, she testified that she was in shock and became almost paralyzed. She testified that he asked her, "[W]ell, what do you think?" (R. at 434.) She said she told him to put his pants on and give her a beer.[4] (R. at 462.)

---

[3] Mr. Carl Moon was a guest at the motel with whom Appellant had on several prior occasions spent time drinking and talking outside his room in the evening. However, Mr. Moon was not able to recall the details of the events that day in sufficient detail to definitively confirm or contradict Appellant's testimony. He recalled that both DC3 A and Appellant entered Appellant's room. He also recalled seeing DC3 A exit approximately twenty to thirty minutes later. Thereafter, he said Appellant came out of the room with a beer in his hand and spoke with him. (R. at 925-30.)

[4] In her sworn statement to the agents investigating this incident, she said that when he stood in front of her and asked her what she thought of it, she "told him it was weird it had a curve in it." Appellant Ex. XXI, p. 4.

DC3 A testified that Appellant moved nearer to her and grabbed her wrist in order to guide her hand towards his penis. She testified that he sat down next to her on the bed and put his arms around her, brushing her top aside and fondling her breast while she was still seated on the bed. She testified that she was still reacting in disbelief and shock. DC3 A said that Appellant then stood up, straddled her legs, and with his penis near her face he told her, "Suck it." (R. at 437.)

DC3 A testified that as he moved toward her, she fell back onto the bed. Appellant straddled her torso and continued to attempt to force her to engage in oral sex with him. He pinned her wrists with his hands and then, "he put his knees on my wrists[5] so that he could take his hands away, and then he put like one hand up like above my head to like support himself and then he put the other hand on his erection to try to guide it to my mouth." (R. at 441.) DC3 A said that she turned her head away and clenched her teeth. She testified that he had a violent, angry look on his face and, "It was like oh, my God, I'm not going to make it out of here." (R. at 1401.) According to DC3 A's testimony, she could not escape because Appellant still had her wrists pinned down. She testified that after failing to force her to engage in oral sex, Appellant attempted to have sexual intercourse with her. DC3 A testified that she was finally able to get Appellant to desist by forcefully biting him on the shoulder.

DC3 A did not immediately report her accusations to her command. However, on the Monday following her return to the NESU, DC3 A told another petty officer that Appellant had attempted to have nonconsensual sex with her—but DC3 A made him promise not to tell anyone. Several weeks later, DC3 A's command decided to condition a favorable recommendation for promotion on her successfully completing thirty days of temporary shipboard duty during a cutter's upcoming refresher training. Although it is not precisely clear when she was counseled about this decision, it was shortly thereafter that DC3 A accused Appellant of the actions that were the subject of this case. However, first she confronted Appellant and secretly recorded their conversation.[6] Then she met with her Chief Petty Officer and the Executive Officer at the NESU to raise her concerns over continuing to work with Appellant. That same day she also met with the Work-Life staff and then with Coast Guard investigators.

When approached by the investigators looking into those allegations, Appellant initially denied that anything happened between himself and DC3 A in his motel room. However, after agreeing to submit to a polygraph, he admitted to the events as he related them at trial. He explained his earlier denials by stating that he was both worried and embarrassed at having violated the rules pertaining to fraternization between seniors and subordinates.

---

[5] In her sworn statement to the investigating agents, DC3 A said that Appellant pinned her wrists above her shoulders with his knees. *Id.*

[6] In the tape, DC3 A told Appellant that she was not comfortable going on road trips with him anymore because of what happened. She went on to express her concern over not being recommended for promotion and whether that was some sort of backlash. Appellant replied that she had been recommended for promotion, and that the time on ship would be good for her professionally. He also told her, "I hope you're not saying that trying to scare me into saying that's why you weren't recommended for, and all the sudden you're going to bring that up. And nothing happened." Appellant Ex. XVII, p. 4. Appellant went on to say, "You know I'm not going to hurt you or do anything to you—anything." *Id.* at 5.

During the trial the defense attempted, with some success, to demonstrate that DC3 A's accusations should not be trusted. DC3 A's former supervisors, shipmates, and a former roommate expressed little or no confidence in DC3 A's truthfulness or integrity. Her former roommate described herself as a friend, but went on to testify, "It's my opinion that [DC3 A] has a very poor character for honesty and truthfulness." (R. at 1141.) DC3 A's problematic reputation was established by both the live testimony and stipulations of a number of witnesses who had served with DC3 A in different settings. At least one of those witnesses may have formed their opinion of DC3 A's dishonesty based on what they believed was a previous false allegation that she was the victim of sexual assault. However, this prior instance of DC3 A falsely reporting a sexual assault was never brought up before the members.

Both the Government and the Defense produced expert witnesses who testified at length concerning rape trauma syndrome and whether DC3 A's actions and her reports of symptoms were attributable to the Appellant's alleged sexual assault. The counselors to whom DC3 A was referred by her Command clearly accepted her claim that she was the victim of an attempted rape. They conceded that they presume their patients are truthful, absent clear indications to the contrary. The forensic psychiatrist who testified for the Defense was decidedly more skeptical of DC3 A's accusations. He agreed with the Defense's contention that the list of rape trauma symptoms provided to DC3 A by the Coast Guard Work-Life staff rendered her subsequent reports of those same symptoms somewhat less reliable. Although the Defense's forensic psychiatrist did not examine DC3 A in person, his assessment of her medical history and her testimony in Court identified a variety of reasons to doubt the accuracy of her account.

## II.
## Failure to Make LT Norris Available as IMC

Appellant argues that the Government improperly determined that the counsel he sought as Individual Military Counsel (IMC) was unavailable on the basis of an ethical conflict. Although we are somewhat puzzled and dismayed by the declaration of LT Norris that his position on the staff of the Staff Judge Advocate would inhibit him in performing the duties of IMC, we believe that we are bound to honor his determination. We agree with the Government's contention that under the rule set forth in the then-current Military Justice Manual (MJM), Commandant Instruction M5810.1C (Jan. 15, 1991), section 3-C, counsel needed to be personally satisfied that a conflict of interest would not, in fact, detract from their performance of IMC responsibilities.

Although it is regrettable that Appellant was only afforded his choice for IMC after three other attorneys were ruled not available, we find that the determination of the Staff Judge Advocate in applying the applicable criteria did not amount to an abuse of discretion. Moreover, we are convinced that the representation provided Appellant met the standard set forth in *United States v. Strickland*, 466 U.S. 668 (1984), as made applicable to military trials by *United States v. Scott*, 24 M.J. 186, 187 (CMA 1987).[7]

---

[7] While not falling to a level constituting ineffective assistance of counsel, the trial defense counsels' performance fell short in several respects. They did not aggressively explore the inconsistencies between DC3 A's sworn

### III.
### New Member Reads Transcript of Prior Testimony

After the commencement of the trial on the merits, one of the members was excused from further service on the Court due to a serious illness in his family. The new member appointed to replace the removed member was given the transcript of the witnesses' testimony admitted into evidence up to that point in the trial. With the concurrence of both trial and defense counsel, the new member read the relevant excerpts of the transcript without the other members being present. This was not the proper procedure. Rule for Courts-Martial (RCM) 805(d)(1), Manual for Courts-Martial (MCM), United States (1995 Ed.); *see also United States v. Freeman*, 12 M.J. 542 (A.C.M.R. 1981). The previously admitted testimony should have been read aloud for the new member in the presence of the other members. However, absent plain error, the failure to object forfeits the error. Even in the case of plain error, there must be prejudice to the substantial rights of the Appellant to constitute a basis for granting relief. *United States v. Powell,* 49 M.J. 460, 464 (1998). In this instance, even assuming that this irregularity amounted to plain error, we do not think the Appellant's substantial rights were prejudiced. Accordingly, we reject this basis for relief.

### IV.
### Use of Suppressed Evidence by the Government

When investigators interviewed Appellant in connection with the polygraph examination, they failed to inform him of the additional offenses of which he was then suspected. Based upon that failure to warn Appellant, the military judge suppressed all statements by Appellant obtained during that interview, including the polygraph itself and a drawing made by Appellant in which he attempted to depict the tattoo on DC3 A's pubic mound.[8] (R. at 295.)

Appellant claims that trial counsel's use of this suppressed drawing during cross-examination was error. However, the military judge only allowed trial counsel to ask Appellant if the drawing was an accurate depiction of the tattoo. The military judge did not allow the introduction of the drawing into evidence, nor did she allow the members to learn the source of the drawing or whether it was an accurate or inaccurate depiction of the tattoo. Under Military Rule of Evidence (MRE) 304(b)(1), suppression of such statements does not prohibit their use for impeachment purposes. *See United States. v. Holt*, 46 M.J. 853, 863 (N.M.Ct.Crim.App. 1997), *aff'd*, 52 M.J. 173 (1999), *cert. denied*, 529 U.S. 1100 (2000) (citing *Harris v. New York*, 401 U.S. 222 (1971); *United States v. Williams*, 23 M.J. 362 (CMA 1987)).

---

statement to investigators and her testimony at trial or the reasonableness of her ostensible purpose for entering Appellant's room. In a case where the outcome rested almost entirely on the credibility of the Government's main witness, it was incumbent on the Defense to thoroughly probe that witness' assertions.

[8] It is apparent that the Government sought to accentuate the difference in the orientation of the figure drawn by Appellant as compared with the actual tattoo of the salamander on DC3 A's pubic mound. However, although the Defense seems to concede the difference between the drawing and the actual tattoo is significant, we are instead struck by its strong similarity to that tattoo. Under the circumstances that Appellant claims surrounded his brief exposure to DC3 A's tattoo, it would be entirely reasonable for him to find it difficult to draw a completely accurate depiction of the tattoo.

In this instance, we believe that the military judge appropriately balanced the right of the Government to attempt to rebut Appellant's testimony with the Defense's interest in keeping suppressed evidence from the members. Here Appellant had just testified that DC3 A had voluntarily shown him the tattoo on her pubic mound, a point on which her testimony sharply diverged from Appellant's. It was not unfair, nor improper, for the Government to probe the veracity of Appellant's claim in this manner, especially considering the extremely limited use of the drawing permitted by the military judge. While we suspect that Appellant's answer to trial counsel's question may well have been damaging in the eyes of the members, we do not find the use of the drawing in this instance to have constituted error.

## V.
### Including Item Not Admitted Into Evidence on the Evidence List Provided to Members During Deliberations

After the members issued their findings, the exhibits were provided to them for their deliberations. The exhibits were in a binder along with a list of the exhibits. The drawing of the tattoo was listed as an exhibit, although it had not been introduced into evidence. During their deliberations, the members requested the drawing of the tattoo. The military judge told the members that the drawing was not available to them because it had not been admitted into evidence.

Appellant argues that the members obviously attached significance to the drawing of the tattoo, as indicated by their request, and that the drawing was therefore arguably given a prominence that was inappropriate. Appellant argues that the military judge's failure to *voir dire* the members concerning the influence of this error prevented the possibility of curing the influence of this extraneous information.

We have already determined that the use of the drawing during cross-examination in this case was proper, and it therefore follows that it was proper for the members to be aware of the drawing's existence. The mistaken listing of the drawing as an exhibit did not render the members' knowledge of its existence improper. Nor can we see how its presence on this listing substantially prejudiced Appellant. Even if the drawing itself had been provided to the members, it is by no means clear that it would have adversely influenced the outcome. The taking of improper material into the deliberation room is not *per se* reversible error. "Prejudice must be determined in view of the circumstances of each case." *United States v. Austin*, 35 M.J. 271, 277 n.6 (CMA 1992); *see also United States v. Ureta*, 44 M.J. 290 (1996), *cert. denied*, 519 U.S. 1059 (1997). The mere fact that the members asked about the drawing, which had not been attributed to Appellant, does not constitute a basis for concluding that its inclusion on the exhibit list was likely to result in any untoward conclusions by the members.

If there was any damage done to Appellant's theory of the case by this drawing, it was by virtue of his response during cross-examination that he didn't know whether it was an accurate representation of the tattoo on DC3 A's pubic mound. Accordingly, even if the listing of this

drawing on the exhibit list were considered plain error, we find that it did not prejudice the substantial rights of Appellant.  *See Powell*, 49 M.J. at 464.

## VI.
## Factual Sufficiency of the Findings

We are required by Article 66(c), UCMJ, to reach our own independent determination that the findings and sentence are both correct in law and fact—and should be approved—based on the entire record.  "In considering the record, [we] may weigh the evidence, judge the credibility of witnesses, and determine controverted questions of fact, recognizing that the trial court saw and heard the witnesses." Art. 66(c), UCMJ.  In short, our Court must be convinced beyond a reasonable doubt that the findings are both factually and legally correct.  *United States v. Turner*, 25 M.J. 324, 325 (CMA 1987); *United States v. Hayes*, 40 M.J. 813 (CGCMR 1994).

There is no dispute as to the following facts, on which both the Appellant and DC3 A's testimony agree: (1) DC3 A went to Appellant's room voluntarily on her own initiative; (2) Appellant at some point exposed his penis to DC3 A; (3) DC3 A did not leave or attempt to leave when Appellant exposed himself to her; (4) there were some verbal and physical overtures for DC3 A to engage in oral sexual contact with Appellant; (5) no oral sexual contact occurred.  It is clear that by his undisputed actions with a subordinate in his chain of command, Appellant violated the general regulation against fraternization.  However, Appellant was not charged with violating this regulation.  It is also clear that Appellant attempted to have DC3 A engage in oral sex with him, notwithstanding Appellate Defense Counsel's arguments to the contrary.

Key facts that are in dispute include whether: (1) Appellant lowered his shorts and exposed his penis without encouragement, or DC3 A invited this conduct by asking to see his penis after she had displayed the tattoo on her pubic mound to Appellant; (2) Appellant tried to force DC3 A to engage in oral sex in the manner described by DC3 A, or they engaged in mutual foreplay that was never consummated; (3) DC3 A's wrists were pinned by Appellant's knees and he attempted to force his penis into her mouth as she lay on the bed, or Appellant simply lay on top of her as they "bumped and grinded" while still wearing their clothes; (4) DC3 A caused Appellant to stop by forcefully biting him on his shoulder, or DC3 A laughed and gave him a kiss after Appellant stopped with the observation that "this isn't going to happen."

The dissent is persuaded that these disputed facts were properly resolved in favor of DC3 A's version of events.  In his dissent, Judge Kantor rightly notes that the medical personnel and counselors who treated DC3 A believed her claim that Appellant had attempted to rape and forcibly sodomize her.  However, we do not find the Government's experts particularly helpful.  As their testimony makes clear, the Government's experts based their medical conclusions and treatment largely on the assumed accuracy of the "facts" related by their patient, DC3 A.  Moreover, the Defense introduced the testimony of a forensic psychiatrist, trained to assist law enforcement personnel in analyzing criminal cases, who offered several reasons he was skeptical of DC3 A's testimony.  While we do not completely discount these diverging assessments, we do not think that the expert testimony in this case is all that helpful in resolving the disputed facts on which the outcome of Appellant's case rests.

Ultimately, this case boils down to a swearing contest between the two involved parties. Consequently, the resolution of the disputed facts inevitably requires an assessment of these witnesses' credibility. As already noted, the character witnesses for Appellant established his reputation for outstanding performance and dependability. Their assessment of his veracity stood in sharp contrast to the testimony concerning DC3 A's character. Her co-workers, even a friend and former roommate, all expressed serious reservations about her truthfulness. We find the stark contrast between the assessments of those who knew them to be especially significant. While we will never know with certainty what actually happened in Appellant's motel room, we have concluded there is ample reason to doubt DC3 A's version of those events. We are constrained to disapprove any charged violation for which we are persuaded there is reasonable doubt. Having carefully considered the record in this case and the evidence that supports the trial court's findings, it is clear that, based on his own testimony, Appellant demonstrated remarkably poor judgment, violated the Service regulation governing interpersonal relationships, and attempted to engage in oral sodomy with DC3 A. However, we do not find the most serious charges in this case proven beyond a reasonable doubt. Accordingly, we have taken action to affirm only the charged violation that we are convinced is fully supported. We have reassessed the sentence accordingly.

## VII.
### Conclusion

We have reviewed the record in accordance with Article 66, UCMJ, and after carefully considering the evidence, we affirm the finding of guilty of Charge I, but only so much of the charged Specification 2 as extends to its lesser included offense, attempt to commit consensual sodomy. We find this Charge and its specification, as revised, correct in law and fact, and, on the basis of the entire record, should be approved. Accordingly, those findings of guilty are affirmed. The findings of guilty of Charge II, and its Specification; Charge IV, Specifications 1, 2, 4, 6, and 7; and the Additional Charge with its Specification, are disapproved.

In reaching our determination of an appropriate sentence in this case, we carefully considered the entire record, including the nature of the offense and the evidence of record concerning Appellant's service to the Coast Guard. We have decided that the approved sentence should not exceed forty-five days confinement and a reduction in grade to E-5. Accordingly, the bad conduct discharge is set aside and only so much of the sentence as provides for forty-five days confinement and reduction to E-5 is affirmed.

Chief Judge BAUM concurs.

KANTOR, Judge, concurring in part and dissenting in part:

I concur with the majority as to its resolution of the assigned errors and offer no further comment as to those issues. However, having thoroughly reviewed the record and making the necessary allowances for not personally observing the witnesses, I am convinced beyond a reasonable doubt that the findings of the trial court, as approved by the convening authority, are factually supported by the evidence contained within the record. *United States v. Turner*, 25 M.J. 324 (CMA 1987); *United States v. Hayes*, 40 M.J. 813 (CGCMR 1994). Therefore, I respectfully dissent from that portion of the opinion where the majority relies upon this Court's plenary Article 66(c), UCMJ, authority to affirm only so much of Specification 2 of Charge I as extends to the lesser included offense of an attempt to commit sodomy and to disapprove the findings of guilty to Charge II and its Specification, Charge IV, Specification 1, and the Additional Charge and its Specification. I would, thus, affirm the findings and sentence adjudged at trial and approved by the Convening Authority.

The majority is correct that this case largely hinges on the credibility of DC3 A. I would add that it also hinges on the credibility of the Appellant who testified as well. As so often happens in cases of this nature, the testimony of the alleged victim and the alleged perpetrator are conflicting and portray two entirely different scenarios. I start with the account provided by DC3 A, who alleged that she was sexually attacked by the appellant in a motel room while both were performing temporary duty in North Carolina. Initially, I do not deny that DC3 A has had a troubled history and Coast Guard career. In addition, several witnesses testified that she had a penchant for shading the truth to suit her own needs. Some went further and offered opinion evidence as to her poor character for truthfulness, though most had difficulty identifying any specific instances of lying. However, I found her testimony regarding the events that took place within the motel room on the night of June 5, 1996 to be detailed, credible, and consistent. Most important, the record contains strong corroboration from other witnesses, particularly her treating psychiatrist, Dr. Letourneau, and other health professionals. Dr. Letourneau's diagnosis was the DC3 A was suffering from post-traumatic stress disorder that requires a traumatic life experience, such as a sexual attack, as a triggering event. In spite of DC3 A's troubled history, Dr. Letourneau was adamant in his opinion that the traumatic event that triggered her current condition was the direct result of the incident involving the appellant on June 5, 1996. Other testimony from a close acquaintance also noted a marked change in personality following the alleged incident.

The Appellant offered a different version of the critical events that took place within the motel room. According to him, it was DC3 A who purposely entered his room and initiated sexual foreplay by asking him if he wanted to see her tattoo, a reproduction of which he was unable to identify at trial. However, before this foreplay led to actual sodomy or intercourse, it was mutually terminated. There is little evidence to corroborate the Appellant's account. Evidence was admitted, however, that tends to question the veracity of the Appellant as well as his character for peacefulness. In a sworn statement given to Coast Guard investigators, the Appellant denied that anything inappropriate had taken place between him and DC3 A on the night in question. More troubling was the evidence that following his separation from his wife, the Appellant threatened his wife, threatened to burn down her house if he found another man in

it, and actually assaulted his wife on one occasion.  While the majority opinion intimates that DC3 A may have intentionally lured the Appellant into a compromising situation to gain a favorable endorsement for promotion, I am reluctant to accept that theory.  I find no evidence in the record indicating that DC3 A had deceived two highly trained psychiatrists over an extended period of time into believing that she was suffering from post-traumatic stress disorder caused by the Appellant.  Believing that each of these offenses was proven beyond a reasonable doubt, I would affirm the findings and sentence adjudged at trial and approved by the Convening Authority.



For the Court,


//s//
Kevin G. Ansley
Clerk of the Court