UNITED STATES, Appellee

v.

Todd A. NIMMER, Interior Communications Electrician Second Class U.S. Navy, Appellant.

No. 94–0768.
CMR No. 922146.

U.S. Court of Appeals for the Armed Forces.

Argued March 9, 1995.

Decided Sept. 29, 1995.

For Appellant: *Lieutenant William M. Schrier*, JAGC, USNR (argued); *Lieutenant Alice B. Lustre*, JAGC, USNR (on brief); *Commander Mary T. Hall*, JAGC, USN.

For Appellee: *Major Laura L. Scudder*, USMC (argued); *Colonel J. Composto*, USMC, and *Commander S.A. Stallings*, JAGC, USN (on brief); *Colonel T.G. Hess*, USMC.

*Opinion of the Court*

WISS, Judge:

1. This is an appeal from a special court-martial conviction by officer members for wrongful use of cocaine.[1] We agreed to consider whether the military judge abused his discretion when he excluded expert testimony regarding a negative hair analysis for presence of a cocaine metabolite, which was offered by the defense as tending to rebut the prosecution's allegation of a one-time use of cocaine.[2] *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *United*

---

1. Appellant was tried and convicted over his not-guilty pleas of wrongfully using cocaine some-time between January 13 and 27, 1992, in violation of Article 112a, Uniform Code of Military Justice, 10 USC § 912a. The members sentenced him to a bad-conduct discharge, confinement and forfeiture of $520.00 pay per month for 2 months, and reduction to the lowest enlisted grade. The convening authority approved these results, and the Court of Military Review (*see* n. 3, *infra*) affirmed. 39 MJ 924 (1994).

2. The issue that we granted was phrased by appellate counsel as follows:

WHETHER APPELLANT WAS DENIED THE FULL OPPORTUNITY TO PRESENT A DEFENSE WHERE THE MILITARY JUDGE AND THE COURT OF MILITARY REVIEW RULED THAT DR. SMITH'S TESTIMONY REGARDING THE NEGATIVE RESULTS OF THE HAIR ANALYSIS WERE INADMISSIBLE AND THEREFORE THIS INFORMATION WAS NOT PRESENTED TO THE MEMBERS.

*See* 41 MJ 340 n. 2 (1995), as to the other granted issue (40 MJ 299).

*States v. Gipson*, 24 MJ 246 (CMA 1987). Under the circumstances of this case, we conclude that a remand to the court-martial is necessary for relitigation of appellant's proffer of the expert testimony in question. *See United States v. Gates*, 20 F.3d 1550 (11th Cir.1994); *United States v. Rincon*, 11 F.3d 922 (9th Cir.1993); *United States v. Amador–Galvan*, 9 F.3d 1414 (9th Cir.1993).

## I

2. Appellant is a second class petty officer with over 7 years of excellent service. On January 27, 1992, as part of the routine incident to reporting to his new command at Recruit Training Center Great Lakes, Illinois, he submitted a urine sample for analysis. Three days later, the sample was reported positive for cocaine, though barely: The reading of 151 nanograms per milliliter (ng/ml) is only 1 ng/ml above the cut-off level for positive reports for the radioimmunoassay test (RIA) and only 51 ng/ml above the cut-off level for the gas chromatography/mass spectrometry (GC/MS).

3. The ensuing trial pitted the urinalysis results and expert testimony explaining them against appellant's sworn denial of ever knowingly using cocaine. The defense theory seemed two-fold: First, appellant had not used cocaine, and the urinalysis for some reason simply was wrong; second, if the urinalysis was correct, appellant's ingestion had been unknowing.

4. The latter theory (although ultimately unsuccessful) was supported by testimony from the Government's expert witness that the amount of cocaine necessary to produce a reading as low as appellant's was so small that the person ingesting it might not have any noticeable effects. The former theory (also ultimately unsuccessful) was supported by appellant's forthright assertion of never having used cocaine and by his record of lengthy good service. The issue before us arose from appellant's efforts to offer additional evidence that he argues further would have tended to indicate non-use.

5. The evidence in question was the subject of a pretrial hearing under Article 39(a), Uniform Code of Military Justice, 10 USC § 839(a). There, the defense sought admission of the results of a hair analysis. On February 8, a physician had removed from appellant's head five "pencil-sized" dots of hair that subsequently had been tested at AccuTox Analytical Laboratories in Attalla, Alabama. Specifically, appellant sought to introduce testimony of Dr. Frederick P. Smith, the scientific director of that laboratory, who was offered and accepted "as an expert in hair testing for drug use through RIA and GC/MS." Dr. Smith would state that "there was no detectable amount of benzoylecgonine [the cocaine metabolite] in Mr. Nimmer's hair." The inference that he would draw from that result is that, "[b]ased on the inch and a half length of the hair, there's no evidence that Mr. Nimmer ... used cocaine over the past—the month—or three-month period covered by the inch and a half growth of that hair; that it shows no evidence of cocaine use." Later, when asked to state again the inference he would draw from the absence of any detectable benzoylecgonine in appellant's hair sample, Dr. Smith stated: "The reasonable inference is that Mr. Nimmer did not consume cocaine—any substantial amount of cocaine during the interval covered by that hair growth."

6. After intense litigation of this matter, the military judge ultimately ruled against admission of appellant's hair-analysis evidence. In doing so, he made the following findings of fact:

[F]ive, the AccuTox Laboratory is certified by NIDA [National Institute on Drug Abuse, part of the U.S. Department of Health and Human Services] to perform federal urinalysis testing; six, the NIDA standards are stringent; seventh, the AccuTox Lab has no certification for hair analysis; eight, no certification of laboratories exists for hair analysis; nine, acceptable scientific procedure and forensic analysis of drugs requires a screening process and a separate and distinct confirmation process; ten, radioimmunoassay and gas chromatography/mass spectrometry are commonly utilized and generally accepted scientific techniques for this type of analysis; eleven, these techniques were em-

ployed by AccuTox in analyzing the accused's hair sample; twelve, the standard operating procedures and quality controls procedures utilized by AccuTox fall within the scheme of those generally accepted of those performing drug analysis; thirteen, testing hair for the presence of drugs is neither widely conducted nor widely accepted within the scientific community; fourteen, chronic cocaine use can be detected by hair analysis, and that fact is generally accepted within the scientific community; fifteen, how cocaine metabolites enter the hair and affix there is not known; sixteen, whether cocaine metabolites may be washed away by shampooing or washing them prior to urinalysis [sic] is not known; seventeen, two recent awaiting publication studies indicate that one-time use of drugs will result in metabolites presence in hair, although in those studies, the drugs, one of them was cocaine, were ingested by injection; eighteen, these studies indicate the presence of cocaine metabolite occurred as quickly as eight hours after ingestion in one case and over a month afterwards in another with the bulk of the sample occurring or showing the presence of that metabolite between those dates; nineteen, no other evidence exists that one-time use of hair analysis—one-time use of cocaine would show up in a hair analysis; twenty, hair analysis results have been admitted in a court only when other corroborating evidence was present; twenty-one, no uniformity in testing procedures presently exists within that portion of the scientific community engaged in hair analysis; twenty-two, the growth rate of hair is not uniform.

7. Immediately after entering these factual findings, the military judge offered the following legal reasoning and conclusions:

This court is required to balance the soundness and reliability of the process used, the evidence's possibility to confuse the factfinder, and the connection of the evidence to a disputed factual issue in the case in determining whether to admit novel scientific evidence. I do not find the evidence in this case would confuse the court members.... Moreover, the evidence clearly goes to a disputed factual issue in the case, that is, did or did not the accused use cocaine as charged. Consequently, both these factors argue for admissibility.

It is on the issue of the soundness and reliability, however, that the court has trouble. The ability of hair analysis to detect the one-time use of cocaine metabolite [sic] is not well established or generally accepted in the scientific community. There is no reliable evidence that, had this accused used cocaine on the 24th of January, the hypothetical use date referred to in the testimony, that it would have been present in the hair cut from his head on 8 February 1992. The studies referred to by Dr. Smith, two in number and, thus, of somewhat diminished persuasiveness, certainly don't establish a norm with which this court is comfortable saying, if cocaine had been used in this case, it would have shown up in the accused's hair. Moreover, only one of these studies dealt with cocaine and only one with hair from the head as opposed to beard hair. That I have questions about where the hair in the studies was obtained from [sic] and what difference that might make merely underlines the court's concern that, while the procedures employed, that is, RIA and GC/MS, may be beyond reproach, the underlying theory and knowledge deficit in this area remain. I also believe the concerns about washing and linearity are valid and not yet answerable.

Consequently, the court is convinced that the results of analyzing hair for drugs is inadmissible because it lacks the necessary scientific underpinning to reliably be able to detect a one-time use of cocaine. In short, it lacks the objective, demonstrable certainty associated with science. Balancing this fact against the other two areas and giving full weight to the law's desire to admit new scientific evidence, I hold that the proffered evidence to be inadmissible because it is unreliable and therefore not relevant.

8. On appeal, the Court of Military Re-

view[3] sustained the military judge's ruling. The court held that the military judge had followed the correct analytical approach to determine admissibility of this scientific evidence under the Military Rules of Evidence, Manual for Courts–Martial, United States, 1984. *See United States v. Rodriguez*, 37 MJ 448 (CMA 1993); *United States v. Gipson, supra; see also Daubert v. Merrell Dow Pharmaceuticals, Inc., supra* (holding that the Federal Rules of Evidence had replaced the standard articulated in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), governing admissibility of scientific evidence). Then, after adopting the military judge's findings of fact as their own, *see* Art. 66(c), UCMJ, 10 USC § 866(c), the appellate court opined that "the military judge correctly [had] concluded that the hair analysis did not rest on a 'reliable foundation' such that it could prove or disprove a recent, one-time cocaine ingestion without further developments in the science of hair analysis." 39 MJ 924, 928 (1994).

## II

### A

9. In 1987, this Court noted the sharp division among commentators and courts over the question whether the Federal Rules of Evidence were consistent with or had overcome what, until then, had been the prevailing (though increasingly criticized) standard for testing admissibility of scientific evidence. *United States v. Gipson, supra* at 250. That long-standing test, first articulated in *Frye v. United States, supra,* required that the proponent of scientific evidence establish as a foundation for admission that the evidence was of a type that was generally accepted in the scientific community.

10. This Court noted, as well, that the Military Rules of Evidence were "patterned after the Federal Rules" and that, indeed, the rules pertinent to this issue virtually were identical. *United States v. Gipson, supra* at 250–51. After careful consideration of Mil.R.Evid. 401–03 and 702, the Court concluded:

3. *See* 41 MJ 213, 229 n. * (1994).

Taken together, the rules seem to describe a comprehensive scheme for processing expert testimony. Such a scheme is within the President's authority to promulgate rules of evidence for courts-martial. Art. 36(a), [UCMJ,] 10 USC § 836(a). We therefore agree that *Frye* has been superseded and "should be rejected as an independent controlling standard of admissibility." [*United States v. Downing,*] 753 F.2d [1224] at 1233–37 [(3d Cir.1985)]; *see* Imwinkelried, [*The Standard for Admitting Scientific Evidence: A Critique from the Perspective of Juror Psychology,* 100 Mil.L.Rev. 99 (1983)].

24 MJ at 251.

11. In the stead of the *Frye* test, *Gipson* articulated "reliability" of the evidence as the standard. As to the degree of reliability, the Court focused on Mil.R.Evid. 702 and quoted from *United States v. Downing,* 753 F.2d at 1235, which had suggested that "the helpfulness standard of Fed.R.Evid. 702 is said to 'impl[y] a quantum of reliability beyond that required to meet a standard of bare logical relevance.'" 24 MJ at 251. Fed.R.Evid. 702, like Mil.R.Evid. 702, provides as follows:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

After posing the question of "how is a judge to know whether scientific evidence has a tendency to prove a fact or will assist the factfinder[,]" the Court simply made the general observation that the judge ordinarily should rely on his "own experience, his general knowledge, and his understanding of human conduct and motivation." The only particular tool suggested by the Court to assist judges in their exercise of this "'judgment' ... is that very degree of acceptance in the scientific community we just rejected as the be-all-end-all standard." However, the Court made clear—but without being more specific—that "[o]ther factors may now be equally persuasive." 24 MJ at 251–52.

12. Six years later, in *Daubert v. Merrell Dow Pharmaceuticals, Inc., supra,* the Supreme Court of the United States reached the same conclusion in the context of the Federal Rules of Evidence, holding that *Frye*'s general-acceptance test had not survived enactment of the Federal Rules of Evidence in 1975. Instead, the Court looked to and interpreted Fed.R.Evid. 702 as the controlling standard.

13. One writer offered this summary of the *Daubert*-mandated approach under Fed.R.Evid. 702:

According to the Court, science is "a process"; and a proposition constitutes "scientific ... knowledge" eligible for admission under Rule 702 if it is "derived by the scientific method" of formulating hypotheses and conducting research to determine the truth or falsity of the hypothesis. In the Court's words, the expert's theory "must be supported by appropriate validation [methodology]."

The Court then elaborated, listing several factors which should inform a trial judge's decision whether there has been adequate validation of a scientific conclusion:

1. Whether the proposition has been tested;

2. Whether the proposition has been subjected to peer review;

3. Whether the technique has a known error rate;

4. Whether there are operational standards for using the technique; and

5. Whether the methodology is generally accepted.

Imwinkelried, *The Daubert Standard for Validating Scientific Evidence Linking Us To The Scientific Past,* Shepard's Expert & Scientific Evidence Quarterly (hereafter Shepard's) 493, 494 (Vol. 1, Issue 3, Winter 1994). As the same commentator put it on a different occasion, "The focus [under *Daubert* ] shifts from the acceptance of the proposition to the acceptability of the methodology validating it." Imwinkelried, *The Daubert Decision: Frye Is Dead, Long Live The Federal Rules of Evidence,* Trial 60, 64 (September 1993); *see O'Conner v. Com-*

*monwealth Edison Co.,* 13 F.3d 1090, 1106 (7th Cir.) (For a proposition to be "scientific knowledge," it must have been subjected to the scientific method, so as to rule out "subjective belief or unsupported speculation."), *cert. denied,* —— U.S. ——, 114 S.Ct. 2711, 129 L.Ed.2d 838 (1994).

14. The Supreme Court's 1993 opinion in *Daubert* is fully compatible with this Court's 1987 opinion in *Gipson.* Each reaches the conclusion that the applicable evidentiary rule on expert testimony superseded the *Frye* standard for admissibility of scientific evidence, and *Daubert*'s construction of the rule and its guidance in how to apply it are consistent with the concepts expressed in *Gipson.* Given that Article 36(a) of the UCMJ charges the President to prescribe rules of evidence "which shall, so far as he considers practicable, apply the principles of law and the rules of evidence generally recognized in the trial of criminal cases in the United States district courts"; given that the Military Rules of Evidence generally parallel the form and substance of the Federal Rules of Evidence; and given that Rule 702 in each set of rules is worded identically, one to the other, we conclude that the *Daubert* opinion is persuasive in prescribing the analytical model for determining admissibility of expert scientific evidence in courts-martial.

15. Of course, the military judge in appellant's 1992 court-martial did not have the advantage of the Supreme Court's reasoning in *Daubert.* In similar circumstances of criminal cases on direct review at the time *Daubert* was announced in which the trial court had applied *Frye,* Federal courts of appeals have remanded the cases for application of the *Daubert* construction of Fed.R.Evid. 702. *See United States v. Gates, United States v. Rincon,* and *United States v. Amador–Galvan,* all *supra.* ¶ 1. The military judge, however, did have the benefit of our decision in *Gipson,* which we have just concluded is fully consistent with *Daubert.* Nonetheless, for several reasons, we consider that a remand similarly is appropriate here. *Cf. United States v. Melvin,* 27 F.3d 703, 706–07 n. 4 (1st Cir.1994) (criminal defendant pending direct review "entitled to claim" newly announced "important statutory rights

and procedural rules, when the notion of trial accuracy is at issue").

16. First, while both *Gipson* and *Daubert* held that the rules of evidence had overcome *Frye* as the yardstick of admissibility and while both supplanted general acceptability with reliability as the measure, the precision of the focus on reliability is qualitatively different in the two opinions. Whereas *Gipson* seems to be concerned with reliability of the evidence as a rather general notion, *Daubert* clearly narrows that focus to ensuring reliability of the proffered evidence ("that is, trustworthiness," 509 U.S. at 591 n. 9, 113 S.Ct. at 2795 n. 9) by looking at the validity of the scientific methodology that led to that evidence. "In a case involving scientific evidence, *evidentiary reliability* will be based on *scientific validity.*" *Id.*

17. Second, while both *Gipson* and *Daubert* acknowledge that a trial judge should consider a variety of factors in determining reliability and while both recognize that an important one is the theretofore-absolute consideration of general acceptance in the scientific community, from that point on the two opinions are qualitatively different in the guidance that each offers. For example, as noted earlier, *Gipson* makes only general reference to "[o]ther factors" (24 MJ at 252) and admonishes military judges, in the end, to use " 'the judge's own experience, his general knowledge, and his understanding of human conduct and motivation.' " 24 MJ at 251. In comparison, *Daubert* more specifically sets out a non-exhaustive list of factors to illustrate the considerations that a trial judge should have in mind when making an admissibility ruling. 509 U.S. at 591–93, 113 S.Ct. at 2796–97.

18. Finally, our reading of the record of this litigation leaves us with the sense that it probably would have read much differently if the parties and the military judge had had the benefit of the added specificity and guidance of *Daubert* as a refinement of *Gipson.* To explain, some discussion of an appropriate analytical construct under *Daubert* is helpful.

### B

19. *Daubert* favorably cited Imwinkelried, *The "Bases" of Expert Testimony: The Syl-*

*logistic Structure of Scientific Testimony,* 67 N.C.L.Rev. 1 (1988). *See* 509 U.S. at 586 n. 4, 113 S.Ct. at 2793 n. 4. This law review article explains that the final opinion of an expert scientific witness is the product of a syllogism—that is, application of a major premise to a minor premise that yields a conclusion. The minor premise is the specific information in the particular case at hand, and the major premise applied to it is a general explanatory theory. Thus, the syllogistic reasoning apparent in the litigation in this case may be stated as follows:

MAJOR PREMISE: Use of radioimmunoassay (RIA) and gas chromatography/mass spectrometry (GC/MS) can detect the presence of the cocaine metabolite in head hair taken from a single-time user of cocaine.

MINOR PREMISE: RIA and GC/MS analyses of appellant's head hair detected no presence of the cocaine metabolite.

FINAL CONCLUSION: Appellant did not use cocaine.

*See* Shepard's, *supra* at 497 (This is not a quotation.).

20. The critical question in this syllogism, of course, is the validity of the major premise. The general explanatory theory that constitutes the major premise is the final link in a chain of scientific propositions, each of which must be validated in some way. *Shepard's, supra* at 495. Using a construct similar to that used by Professor Imwinkelried in *Shepard's, supra* at 506, we may depict this chain of linked scientific propositions in the following manner:

STARTING POINT—HYPOTHESIS # 1: Ingestion of cocaine produces a metabolite in the user's body.

INVESTIGATION OF HYPOTHESIS: Numerous reports of research and analysis using the scientific method are available.

CONCLUSION: Judicial notice (*see* Mil. R.Evid. 201(b)(2)) may be taken that the hypothesis has been validated according to the standards and methods of science.

HYPOTHESIS # 2: The scientific method is a valid technique for determining the

presence of that metabolite in the user's body.

INVESTIGATION OF HYPOTHESIS: Numerous reports of research and analysis using the scientific method are available.

CONCLUSION: Judicial notice (*see* Mil. R.Evid. 201(b)(2)) may be taken that the hypothesis has been validated.

HYPOTHESIS #3: RIA and GC/MS are valid scientific screening and confirming tests, respectively, to determine the presence of the metabolite.

INVESTIGATION OF HYPOTHESIS: Numerous reports of research and analysis using the scientific method are available.

CONCLUSION: Judicial notice (*see* Mil. R.Evid. 201(b)(2)) may be taken that the hypothesis has been validated.

HYPOTHESIS #4: Use of RIA and GC/MS can detect the presence of the metabolite in head hair taken from a chronic user of cocaine.

INVESTIGATION OF HYPOTHESIS: There have been reports of certain research and analysis using the scientific method.

CONCLUSION: According to the standards and methods of analytical chemistry (*see Daubert*), the hypothesis has been validated.

HYPOTHESIS #5: Use of RIA and GC/MS can detect the presence of the metabolite in head hair taken from a single-time user of cocaine.

INVESTIGATION OF HYPOTHESIS: There have been reports of certain research and analysis using the scientific method.

CONCLUSION: According to the standards and methods of analytical chemistry (*see Daubert*), the hypothesis has been validated.

Shepard's, *supra* at 497 (This is not a quotation.).

21. The parties had no controversy over the first three hypotheses; indeed, as this construct suggests, the validity of each of them might well have been the subject of judicial notice. *See Shepard's, supra* at 502–04. In any event, there was no objection to any of these implicit links in the chain, so validation under *Daubert* was unnecessary.

22. Appellant first began to encounter trouble from the Government over Hypothesis #4. The cross-examination of Dr. Smith as well as the direct examination of the Government's own expert, Dr. Needleman, fairly reflects the view that the validation of that hypothesis would not be a proper subject of judicial notice through verifiable certainty, *see* Mil.R.Evid. 201(b)(2), and that it would not be accepted by the Government without objection. Hence, its validity would have to be established under *Daubert.*

23. For our present purposes, however, we will proceed under the assumption that this record adequately establishes the validity of that hypothesis. Indeed, the military judge expressly found that "chronic cocaine use can be detected by hair analysis, and that fact is generally accepted within the scientific community." While "general acceptance" no longer is the hurdle that must be cleared for admissibility of scientific evidence, it would seem problematic to view it the other way— that is, that a scientific proposition that was generally accepted in the scientific community as valid ultimately could be kept out.

24. As we indicated earlier, the real litigation in this case was over Hypothesis #5—specifically, whether that proposition has been validated through scientific method. Perhaps unnecessarily, we pause to note that the Supreme Court made clear in *Daubert* (509 U.S. at 591, 113 S.Ct. at 2796) that the judge's validation analysis must be "based on the record." See Chesebro, *Taking Daubert's "Focus" Seriously: The Methodology/Conclusion Distinction,* 15 Cardozo L.Rev. 1745, 1752 (1994). With this in mind, then, we proceed to consider how the litigation as reflected in this record compares against the factors that the Supreme Court suggested are among those that a judge should weigh in determining whether a scientific proposition has been validated so as to constitute "scientific knowledge" within the meaning of Mil.R.Evid. 702.

25. First, the proposition which is Hypothesis #5 is testable and, at least to some extent, has been tested. The military judge's

findings acknowledged that "two recent awaiting publication studies indicate that one-time use of drugs will result in metabolites' presence in hair...." This factor, however, *might be* a mixed bag for appellant: In factual distinction from this case, those studies both involved injection of the drug (one intravenous and one intramuscular); only one involved cocaine; and one involved analysis of beard hair rather than head hair. Whether these distinctions make a *difference* is not clear from the record. Until *Daubert*, litigants and judges would not necessarily reasonably know to focus so directly on this factor.

26. Second, the record seems to indicate that, as of the time of trial, the proposition had been subjected to some level of peer review but not to publication—rather, the two studies mentioned by the military judge then were awaiting publication. "The [Supreme] Court in effect treats publication as circumstantial evidence that the proposition rests on proper scientific procedure. Publication 'increases the likelihood that substantive flaws in methodology will be detected....'" *Trial, supra* at 63, quoting from *Daubert*. Nonetheless, *Daubert* itself recognized, "Publication (which is but one element of peer review) is not a *sine qua non* of admissibility; it does not necessarily correlate with reliability." 509 U.S. at 593, 113 S.Ct. at 2797. With the benefit of *Daubert*'s guidance, it is likely that the parties and the military judge could have and would have more particularly and more expansively focused on peer review as a factor in determining the validity of the scientific methodology in issue here.

27. Third, the record does not reflect whether the technique in question here has a known error rate. While testing is critical in the validation process, evaluation of the test results and conclusions as to known error rate of the technique "figures prominently in deciding whether the hypothesis has been validated." *Trial, supra* at 63. We do not presume, however, that this ineluctably would be manifest to lawyers and judges (as opposed to scientists) so as to charge those who were involved in this pre-*Daubert* litigation with knowledge of the importance of

focusing on this factor in considering reliability.

28. Fourth, the record reflects that the procedures followed by various persons using the methodology in question here were consistent in some respects and varied in others. Uniform standards for using a methodology enable other scientists to retest the proposition and, thus, to repeat the results, which is so important in the validation of a scientific proposition. Here, the record shows that use of RIA and GC/MS is routine but that there is some variation in how often the hair is washed before testing and what it is washed with; how long the hair is; whether the hair is clipped or pulled from the scalp; and where on the body the hair comes from. The record is ambiguous, though, whether these variations have any importance so that they would detract from the procedural uniformity of using RIA and GC/MS. We recognize that the military judge found that "no uniformity in testing procedures presently exists within that portion of the scientific community engaged in hair analysis." The state of this record, however, makes that conclusion problematic. In any event, the added guidance of *Daubert* would make it more likely that the litigants and the judge can focus properly on this factor in the reliability determination.

29. Finally, as to general acceptance of the methodology in the scientific community, the military judge found that there was no such acceptance for purposes of revealing a single-time use of cocaine. Dr. Smith, however, forthrightly asserted that, "[a]mong researchers who are studying this, ... [the methodology] is generally accepted provided that that one-time use is of a substantial nature." In any event, this factor is no longer "the be-all-end-all." ¶ 11 While general acceptance "can be persuasive circumstantial evidence that the methodology is sound," *Trial, supra* at 63, absence of it is not inevitably fatal to a conclusion of reliability. In light of the uncertainties in relation to the other factors just discussed, the military judge's finding in this regard, even if supported by the record, would not assure us that *Daubert*'s contribution to refinement of

*Gipson* would not have reshaped this litigation.

30. In sum, this record reflects a sincere and dedicated effort to follow the general outline of the analysis required by *Gipson;* but it also makes clear that, without the benefit of the specific directional guidance that subsequently was provided by *Daubert*—which was fully consistent with *Gipson* but which, at the same time, was a significant refinement of it—the parties and the military judge were shooting in the dark. Given all the circumstances of this case, we conclude that a more enlightened litigation is necessary.

### III

The decision of the United States Navy–Marine Corps Court of Military Review is set aside. The record of trial is returned to the Judge Advocate General of the Navy for remand to an appropriate convening authority for a hearing before a military judge at which the parties will litigate anew the question of admissibility of Dr. Smith's expert testimony concerning analysis of appellant's hair for the cocaine metabolite. After the military judge has entered findings of fact and conclusions of law that will include a conclusion as to legal admissibility of the evidence in question, the record will be sent directly to the Court of Criminal Appeals for expeditious review of that litigation in light of this opinion. Thereafter, Article 67, UCMJ, 10 USC § 867 (1989), will apply.

Chief Judge SULLIVAN and Judges COX and GIERKE concur.

CRAWFORD, Judge (dissenting):

31. In those jurisdictions that have applied *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923), *e.g., Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 951 F.2d 1128 (9th Cir.1991) (9th Cir. was *Frye* jurisdiction), *vacated,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *United States v. Posado,* 57 F.3d 428, 430 (5th Cir.1995) (5th Cir. was *Frye* jurisdiction), it is rational to remand cases because of the new standard. However, in the *non-Frye* jurisdictions like ours, *United States v. Gipson,* 24 MJ 246 (CMA 1987), no remand would be necessary. *See also United States v. Locascio,* 6 F.3d 924, 938–39 (2d Cir.1993). I dissent from this remand. I do not believe appellant laid an adequate foundation for admission of this evidence.