**UNITED STATES**

v.

**Lieutenant Colonel Paul G. HUBERTY, United States Air Force.**

**ACM 32574.**

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 22 Aug. 1996.

Decided 28 April 1999.

Appellate Counsel for Appellant: Frank Spinner (argued), Colonel Douglas H. Kohrt, Lieutenant Colonel Kim L. Sheffield, Captain Thomas R. Uiselt, and Captain W. Craig Mullen.

Appellate Counsel for the United States: Captain Steven D. Dubriske (argued), Colonel Brenda J. Hollis, Colonel Michael J. Breslin, Colonel Anthony P. Dattilo, and Major Ronald A. Rodgers.

Before SNYDER, Chief Judge, SCHLEGEL and SENANDER, Appellate Military Judges.

## OPINION OF THE COURT

SNYDER, Chief Judge:

Appellant was convicted, contrary to his pleas, by a general court-martial of consensual sodomy, wrongful and dishonorable fondling of his genitals in an area open to public access and view, wrongfully and dishonorably committing indecent acts, and adultery. Articles 125, 133, and 134, UCMJ, 10 U.S.C. §§ 925, 933, and 934. He was sentenced to a dismissal, confinement for 6 months, and a reprimand. The convening authority approved the sentence as adjudged. Appellant has submitted 11 assignments of error for this Court's consideration. Finding no error prejudicial to appellant's substantial rights, we affirm.

Appellant's conviction for dishonorably fondling his genitals arose out of an incident at a public swimming pool in The Netherlands. The sodomy, indecent acts, and adultery occurred with appellant's 17–year–old female legal ward, AKH.

## I. VIEW OF THE PREMISES

### A. Background

Appellant avers that the military judge committed prejudicial error when he denied an unopposed defense request to view the premises of the swimming pool, the scene of appellant's wrongful and dishonorable fondling of his genitals (Specification 1, Charge II). The events supporting this charge occurred on 5 December 1995 at the In de Bende Schwimmbad, a public swimming pool near Landgraaf, The Netherlands, where appellant had taken his young son for an evening swim. He had left his son in the wading pool while he went to change out of his swimming attire. The changing area for each sex consisted, in part, of small individual changing booths and a larger area, which included a shower, across a small walkway or hall from the booths. Although the respective areas for men and women were clearly marked, it was common practice for women to use the changing booths on the men's side but not *vice versa*. However, women were not permitted to enter or use the larger area which contained the shower.

BV, a Dutch national, testified that she and her cousin were changing on the men's side in the booths when they observed appellant walk up and down the walkway twice. BV's booth was across from the doorway to the larger men's changing area, where she had an unobstructed view into the area as a result of the door being open. While she was changing her clothes, she observed appellant nude while he was changing simply by looking through the open door to the larger area. When BV availed herself of a third view of appellant, he was masturbating. When he made eye contact with her, he smiled, spit in his hand, and continued to masturbate. Appellant, on the other hand, testified that he was changing clothes in the large area when he realized the door was open and BV was looking at him. He considered this an invasion of his privacy and tried to communicate that to her by his facial expression and the manner in which he closed the door. He emphatically denied either fondling his genitals or masturbating.

Civilian trial defense counsel argued that a view of the swimming pool by the members

was desired because it was important that the members see how clearly the men's and women's dressing areas were marked and that appellant was where he had a right to be. Further, civilian trial defense counsel argued a viewing was necessary so that the members could see that, contrary to her testimony, BV did not have an unobstructed line of sight view into the large area but had to exert considerable effort to see appellant. The military judge denied the request. He ruled that, "[f]irst, I don't see where this is a complicated thing where either photographs or videos wouldn't be appropriate to use." He also based his decision on the anticipated logistical requirements, including the necessity of taking a court reporter in the event the members had questions during the viewing. In addition to diagrams used by the witnesses, the military judge allowed the prosecution and defense to introduce video tapes of the swimming pool which each had made.

## B. Discussion

■ Rule for Courts–Martial (R.C.M.) 913(c)(3) provides in part that, "[t]he military judge may, as a matter of discretion, permit the court-martial to view or inspect premises or a place or an article or object." The discussion states that "[a] view or inspection should be permitted only in extraordinary circumstances." In view of the rule placing this matter firmly within the sound discretion of the military judge, the standard of review of the military judge's ruling is an abuse of discretion. *See United States v. Marvin*, 24 M.J. 365 (C.M.A.1987); *United States v. Borner*, 12 C.M.R. 62, 66, 1953 WL 2182 (C.M.A. 1953).

■ The party who requests a view or inspection has the burden of proof both as to relevancy and extraordinary circumstances. With regards to the former, the proponent must demonstrate that a view or inspection is relevant to the case. Mil.R.Evid. 401 and 402. However, for purposes of R.C.M. 913(c)(3), the issue asserted by the proponent must be of more than minimal relevance. *Cf. Marvin*, 24 M.J. at 366 (stating that because of witness' inability to identify appellant as perpetrator, "evidence sought to be elicited by the defense either from the view or through testimony about the reenactment would seem of marginal relevance at best").

To meet this prong, the proponent must establish to the military judge's satisfaction that a view or inspection is relevant to the issue of guilt or innocence of the accused, as opposed to a collateral issue. Should the military judge conclude the relevancy requirement is met, the proponent must still demonstrate the existence of extraordinary circumstances.

■ R.C.M. 913(c)(3) and the discussion thereof are based on *Manual for Court–Martial, United States (MCM)*, ¶ 54e (1969 Revised ed.). Drafter's Analysis, *MCM* A21–60 (1995 ed.). The 1969 *Manual*, unlike the 1995 edition, included the exceptional circumstances requirement within paragraph 54e. *See Marvin*, 24 M.J. at 366 n. 4. This distinction, however, is only of passing significance, as the nonbinding, but persuasive, discussion clearly suggests a finding by the military judge of extraordinary circumstances prior to authorizing a view or an inspection is required. At least one of our sister service courts has adopted the discussion's suggestion that a finding of extraordinary circumstances is necessary prior to authorizing a view or inspection. *See United States v. Ayala*, 22 M.J. 777, 795–97 (A.C.M.R.1986). We discern no reason to conclude otherwise. Therefore, this Court now specifically holds that the military judge must find that sufficient extraordinary circumstances exist to justify a view or inspection. This holding naturally raises the question of what will constitute extraordinary circumstances?

■ Extraordinary circumstances exist only when the military judge determines that other available alternative evidence is inadequate to sufficiently describe the premises or object. Alternative evidence includes testimony, diagrams, photographs, or videos. When assessing this factor, the military judge may consider the orderliness of the trial, how time consuming a view or inspection would be, the logistical difficulties involved, safety concerns, or whether a view or inspection would mislead or confuse the members. *See generally United States v. Crochiere*, 129 F.3d 233, 236 (1st Cir.1997) and cases cited therein, *cert. denied*, —— U.S. ——, 118 S.Ct. 1364, 140 L.Ed.2d 513 (1998); *United States v. Williams*, 44 F.3d 614, 618–19 (7th Cir.1995); *United States v. Galla-*

*gher,* 620 F.2d 797, 801 (10th Cir.1980). This list of factors should be read as inclusive, not exhaustive.

 A request for a view or inspection falls squarely under the military judge's inherent authority to manage and control the court-martial. *See, e.g.,* Mil.R.Evid. 104(a); *United States v. Browers,* 20 M.J. 356, 360 (C.M.A.1985) (Cox, J., concurring); *Ayala,* 22 M.J. at 797 n. 42. As such, the fact that a request for a view or inspection is unopposed is not a relevant factor. It should also be clear that the proponent faces a considerable task, as the starting point is that a view or inspection will be allowed only in extraordinary circumstances. The overriding concern is the fair and orderly proceeding of the court-martial. In light of these factors, this Court will accord great deference to the military judge's decision, for the military judge is in the best position to determine whether a view or inspection will help the factfinder make a fair and just determination of guilt or innocence. Only a clear abuse of discretion will result in a contrary determination by this Court. Applying all of the above factors, we find no abuse of discretion by the military judge.

 There was no dispute with regard to the fact that the men's and women's changing areas at the swimming pool were clearly marked. Second, BV never denied that the areas were marked or that she and her cousin affirmatively opted to change on the men's side. The admission of the videos made by both sides and the diagrams of the swimming pool all served to describe the relevant areas of the swimming pool. Therefore, the military judge was well within his discretion when he concluded that the available evidence, balanced against the logistics required and prospect of wasting the court-martial's time, mitigated against a view of the premises. *See* Mil.R.Evid. 403.

## II. LIMITING TESTIMONY OF DEFENSE EXPERT AND ALLOWING REBUTTAL TESTIMONY OF GOVERNMENT EXPERT

### A. Limiting Testimony of Defense Expert

Appellant avers that the military judge committed prejudicial error when he limited Dr. C's testimony to his views of the family dynamics of AKH's and appellant's families and his view of appellant's motives, which were based on his psychological testing of appellant. We disagree.

Dr. C is a forensic psychologist. In addition to the areas on which he was allowed to testify, appellant also proffered Dr. C as an expert witness on whether appellant met the criteria for a diagnosis of exhibitionism. Specifically, in an Article 39(a), UCMJ, 10 U.S.C. § 839(a), hearing outside the members' presence, Dr. C opined that only an exhibitionist would conduct himself in the manner BV testified appellant behaved. Relying on his interpretation of the results of the most recent version of the Minnesota Multiphasic Personality Inventory (MMPI–2) he administered to appellant, Dr. C opined it was unlikely that appellant is an exhibitionist; *ergo,* appellant could not have committed the offense at the swimming pool. Dr. C testified that while the MMPI–2 is not diagnostically sensitive (cannot identify an exhibitionist), it is diagnostically specific (can reliably exclude one from the category). Further, Dr. C opined that, in light of his psychological evaluation of appellant, the offense at the swimming pool and the ones with AKH were mutually exclusive; a person of appellant's personality would not have committed both, as they represent opposite extremes on the personality spectrum.

Applying *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), *United States v. Nimmer,* 43 M.J. 252 (1995), and *United States v. Houser,* 36 M.J. 392 (C.M.A.1993), the military judge ruled Dr. C would not be allowed to express his opinion in this area before the members. The reasons for his ruling were:

1. The issue before the court was not whether or not the accused was an exhibitionist, but whether, on one particular occasion, he exposed himself in a public place. Dr. [C's] testimony would not have assisted the factfinder.

2. The defense failed to establish that only an exhibitionist would stand naked in

a public place, making eye contact with an unknown woman while masturbating.

3. The defense failed to establish the reliability of the MMPI–2 in determining whether an accused acted in conformity with the results thereof.

4. The probative value of any such testimony would be substantially outweighed by the danger of confusion and waste of time.

■■■■ A military judge's ruling denying production of an expert witness, or an expert witness' expert testimony, is reviewed for an abuse of discretion. *United States v. Ruth,* 46 M.J. 1 (1997). The military judge commits error in excluding expert testimony only if his or her ruling is manifestly erroneous. *United States v. Rivers,* 49 M.J. 434 (1998) (citing *General Electric Co. v. Joiner,* 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)). After reviewing the proffers and the testimony of Dr. C, and the military judge's findings, we find no abuse of discretion by the military judge.

Mil.R.Evid. 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

■■■■ Our discussion of this issue will be brief. Neither the Supreme Court nor our superior court assigned a value to any of the *Daubert* factors which the military judge must weigh and balance when performing the gatekeeper function on the admissibility of scientific or expert opinion evidence. This factor notwithstanding, we believe a critical reading of *Daubert* and its progeny reflects that the existence or availability of peer review of and the ability to duplicate the science or methodology in question in order to ascertain an error rate is critical to a determination of admissibility. *See Daubert,* 509 U.S. at 590–93; *Houser,* 36 M.J. at 399; *United States v. Gipson,* 24 M.J. 246, 251–52 (C.M.A.1987). In the absence of an available body of peer review, etc., the proffered expert's testimony should be able to establish

the reliability of his/her methodology via his/her own testing and experience. *See Kumho Tire Co. v. Carmichael,* —— U.S. ——, 119 S.Ct. 1167, —— L.Ed.2d —— (1999); *but see United States v. Campbell,* 50 M.J. 154 (1999). Even where studies and tests exist, they must be shown to be reliable and applicable to the case in issue. *General Electric Co.,* 522 U.S. at ——, 118 S.Ct. at 518–19; *accord United States v. King,* 35 M.J. 337, 342 (C.M.A.1992) (stating "everything the expert says must be relevant, reliable, and helpful to the factfinder"). As the military judge found as fact, the defense proffer failed to demonstrate the validity of the science on which Dr. C based his opinion. This finding is fully supported by the record. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Burris,* 21 M.J. 140 (C.M.A.1985).

■■ Dr. C's testimony during cross-examination candidly conceded the absence of valid scientific support for his theory. When asked if he was aware of any instances in the United States where the MMPI was used to conclude one is not an exhibitionist, he responded: "I know that it's been done, but I cannot specify the case for you." "[I cannot specify the jurisdiction, but] I can tell you the psychologist who did it." When asked if there were any studies which supported his position, Dr. C responded: "[N]o. I just know of other psychologists who have done it. Unfortunately, [they didn't publish their findings and we don't know if anyone else tested it]."

Suffice it to say that, the abandonment of the general acceptance test of *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923), in favor of the helpfulness test of Fed.R.Evid. and Mil. R.Evid. 702 as interpreted in *Daubert* and *Houser,* did not open the floodgate to any and all scientific evidence or expert testimony. All Mil.R.Evid. 702 commands is that a proponent be afforded the opportunity to lay a foundation for admissibility by demonstrating logical and legal relevance and helpfulness. *See Gipson,* 24 M.J. at 252–53. Appellant was accorded that opportunity, but his witness candidly admitted there was no underlying reliable support for the proffered evidence. Scientific evidence or expert testi-

mony of unknown reliability is not helpful to the factfinder. Therefore, the military judge did not abuse his discretion by limiting Dr. C's testimony. *Kumho Tire Co.,* ―― U.S. ――, 119 S.Ct. 1167, ―― L.Ed.2d ――; *General Electric Co.,* 118 S.Ct. at 519.

### B. Admission of Rebuttal Expert Testimony

■■■ As for appellant's averred twin to this assignment of error, neither do we find an abuse of discretion by the military judge allowing the prosecution to present the expert testimony of Dr. S in rebuttal to Dr. C's testimony on AKH's and appellant's family dynamics. Dr. C observed the testimony of AKH and her mother, NH. In the defense's case-in-chief, he testified at length on his perception of AKH's family environment and how, in his opinion, it contributed to her being a manipulative person in order to be the center of attention. Specifically, AKH was adopted by DH and NH after their two natural children were killed, one via murder and the other via a traffic accident. Dr. C opined that the combination of DH and NH being elderly and AKH being a replacement for their deceased children meant AKH was indulged by her adoptive parents, as evidenced by her engagement to marry at age 16 and her fiancé being allowed to reside in her home.

This construct partially provided the grist for Dr. C's opinion on why AKH would have a motive to fabricate the amorous affair with appellant. In stark contrast to AKH's family's dynamics, Dr. C opined that appellant's family and its dynamics were quite wholesome and well within the norm until AKH's addition thereto disrupted it via her manipulative efforts to dominate and occupy all of appellant's available time at the expense of appellant's children. This psychological construct was completed with Dr. C's assessment of appellant as a naïve amateur counselor who mistakenly placed himself in a savior role, which made him ripe for AKH's manipulation. *Ergo,* appellant's intentions towards her, naïve and misguided as they were, were altruistic and paternal, rather than amorous.

The prosecution presented Dr. S' testimony to rebut Dr. C's. The underlying basis of Dr. S expert testimony was her own evaluation of appellant and her review of the allied investigation papers. Unlike Dr. C, Dr. S did not observe either AKH, NH, or appellant testify. The vast majority of her testimony related to her use of the older version of the MMPI and her belief that the MMPI–2 is not a sufficiently reliable diagnostic tool. Further, Dr. S disagreed with Dr. C's position that only a person who met the diagnostic criteria for an exhibitionist would commit an offense like that alleged to have occurred at the swimming pool, and that the two offenses are mutually exclusive. Dr. S opined that there was no valid psychological basis on which to conclude appellant could not have committed both offenses. In fact, her experience is that more than one pathology is found with regards to sexual misconduct offenses.

Dr. S premised her testimony with the *proviso* that the results of the MMPI she administered to appellant were marginally reliable because, in her professional assessment, appellant was not candid in his responses. Dr. S opined that appellant presented narcissistic tendencies and that his intense historical involvement in church and chapel activities could well be the result of a need to be viewed as a hero as well as altruism. The real bone of appellant's contention, however, is Dr. S' opinion that appellant's family appeared dysfunctional, and that appellant's actions, which Dr. C deemed typical of a caring father-daughter relationship, could also be consistent with appellant's grooming AKH for sex. Appellant avers that this was inadmissible "profile testimony." We disagree.

A fair reading of Dr. C's testimony fully demonstrates the basis for allowing Dr. S' testimony in rebuttal. Dr. C presented appellant's family as a model nuclear family until appellant and his wife consented to AKH joining them for their assignment to Germany. Then AKH, an adopted, indulged to the utmost, only-child replacement for two deceased natural children, enters appellant's family and refuses to be a satellite but insists that appellant and his family be her satellite, as was the case in her own adopted family. Dr. C opined that appellant's misguided dedi-

cation to "rescuing" AKH from her past caused him to allow her to manipulate him into alienating his wife because he devoted all of his time to AKH at the expense of his children. Dr. S simply opined that this scenario was not necessarily the case. It was not an abuse of discretion for the military judge to allow Dr. S' testimony in rebuttal. *See United States v. Ingham*, 42 M.J. 218, 227 (1995) (stating, "expert testimony, when injected by a party, often opens the door to experts in rebuttal").

The military judge was vigilant to keep Dr. S' testimony within acceptable bounds, as evidenced in an Article 39(a), UCMJ, session, where he cautioned, "I'm going to sustain any objection [civilian trial defense counsel] makes regarding profile evidence. Are we clear?" Further, civilian trial defense counsel's cross-examination also insured Dr. S' testimony was confined to its relevant limits by pointing out to her that testimony she did not hear would suggest that appellant's actions with and towards AKH were as consistent with a normal father-daughter relationship as with grooming. *See United States v. Johnson*, 35 M.J. 17, 21 (C.M.A.1992). Dr. C also testified in defense surrebuttal. We find no abuse of discretion by the military judge in allowing Dr. S' testimony.

### III. LEGAL AND FACTUAL SUFFICIENCY

 Appellant avers that the evidence is legally insufficient to sustain his conviction. To find a conviction legally sufficient, this Court must determine that, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). When testing for legal sufficiency, every reasonable inference from the evidence must be drawn in favor of the prosecution. *United States v. Blocker*, 32 M.J. 281, 284 (C.M.A.1991); *accord United States v. McGinty*, 38 M.J. 131, 132 (C.M.A.1993). However, to find a conviction factually sufficient, we must determine that, after weighing the evidence in the record of trial and making allowances for not having personally ob-

served the witnesses, we are convinced of the accused's guilt beyond a reasonable doubt. *United States v. Turner*, 25 M.J. 324 (C.M.A. 1987). Applying the standard for the former, we find the evidence legally sufficient.

With regards to factual sufficiency, after allowing for the fact that the court members below heard and saw the witnesses, we also are convinced of appellant's guilt beyond a reasonable doubt. This case is remarkable. Appellant is an officer with 17 years of apparently outstanding service and a reputation for lifelong devoted service to the communities in which he lived and the churches which he attended. Several character witnesses, including the vice commander of a major air command, attested to this reputation and his character. Appellant's character and reputation evidence, combined with the presumption of innocence, presented a redoubtable obstacle for the Government's evidence to overcome beyond a reasonable doubt. But overcome it, the Government's evidence did.

 The Government's witnesses were thoroughly cross-examined, but their testimony withstood this vital crucible of the judicial process. Any motive to fabricate or misrepresent would have been exposed, and this Court discerns no such motive, Dr. C's psychological theories to the contrary notwithstanding. BV's testimony on the events at the swimming pool is direct, clear, and without inconsistency, contrary to the inconsistent statements appellant made regarding the incident. The defense's assertion that BV fabricated the masturbation allegation against appellant in order to preempt a potential complaint by appellant against her is contrary to the evidence.

First, BV essentially admitted that she was an opportunistic voyeur. Second, she was in no jeopardy for having used the men's changing area, as that was quite common at this particular swimming pool. More important, however, is that when confronted by BV and the pool cashier with the masturbation allegation, appellant did not utter even the slightest complaint against BV. Instead, he protested he was not a pervert, pleaded that the police not be called, and stated he didn't intend to hurt anyone. Appellant's own testimony confirmed that he did not voice any

complaint against BV while at the pool. It is counterintuitive to assume he would not point a counter-accusatory finger at BV, had she invaded his privacy in the manner to which he testified.

█ AKH's testimony does not appear to be the product of either fantasy or vitriol. She had returned to Colorado with her parents and resumed her life. When initially contacted by the Air Force Office of Special Investigations, she assumed the investigator was there to discuss someone else's involvement with appellant. When informed to the contrary, she had no desire to discuss the events which transpired between her and appellant.

AKH testified how initially she stopped appellant from touching her breasts while he massaged her back to ease her menstrual cramps, but then allowed it. The massages progressed to petting and then to sex. They engaged in sexual intercourse, including oral sodomy, in appellant's home while his wife was away and on trips which she and appellant took without the rest of appellant's family. There also were two instances of anal sodomy, one of which occurred on a trip without the rest of the family. Their sexual relationship continued until she departed Europe. AKH's testimony was corroborated, circumstantially, by the observations of several other members of the American military community, including her high school principal and some of the teachers at the high school.

Appellant drove AKH to school and picked her up afterwards daily. He also would pick her up for lunch daily. They often were observed with their foreheads touching while in appellant's car. A number of teachers or other employees observed similar conduct. One teacher testified how appellant and AKH were seen leaving the school for lunch almost daily, walking arm-in-arm. Another testified that, on one occasion, they even skipped as they departed. Both opined appellant and AKH, via their actions towards each other, did not present the image of father and daughter. A biology teacher observed appellant and AKH in the school parking lot and, on one occasion, observed them in a store looking at lingerie. She opined that appel-

lant's and AKH's actions with one another struck her as those of boyfriend-girlfriend or husband-wife. Another member of the school's staff saw appellant and a woman cuddling at a movie prior to the start of the film. She assumed appellant was with his wife until the woman rose and departed the theater, and she recognized her as AKH. An employee at a fast food establishment testified he observed appellant and AKH seated in a booth late one evening. He saw appellant kiss AKH on the lips, and it was not a peck. Two members of the chapel community had occasion to observe appellant and AKH weekly. They always sat next to each other during the service, and appellant would have his arm around her as they sang. Both witnesses opined that appellant's and AKH's actions towards each other were not those of father-daughter. Another member of the chapel community, and a former teacher at the high school, described appellant's and AKH's actions towards each other as intimate or romantic. He also observed them at a basketball game and saw AKH sit leaning back between appellant's legs and rub the inside of his thigh.

Two of the teachers at the high school who observed AKH and appellant believed it appropriate to voice their concern to the principal regarding their observations of appellant and AKH. The principal twice reported these concerns to appellant's commander, who—after her second inquiry—informed her there was nothing untoward between appellant and AKH, and she heard nothing further. After the swimming pool incident, however, local command officials apparently deemed it appropriate to open an inquiry into appellant's relationship with AKH. During a search of appellant's desk in his work area, over 70 photographs of AKH (both of her alone and with others, including appellant and his family) were found in appellant's desk. His office did not contain any photographs of his family.

NH testified appellant attended the same church in Colorado Springs, Colorado, as she and AKH, where he was heavily involved with youth activities. He considered himself and AKH close even at this juncture and was reluctant to inform her he was due for reas-

signment. After informing NH and AKH he was headed for Europe, NH jokingly remarked that he could take AKH with him. Next thing NH realized, appellant had aggressively pursued the matter. He obtained legal advice on the prerequisites, eventually obtained her parents' consent, and successfully made AKH his legal ward. She was included on his official orders and accompanied him and his family to Europe.

NH stated that her suspicion was first aroused by the fact that, during their weekly telephone conversations, AKH never made any mention of dating. All her activities centered around appellant. When she and her husband, DH, arrived in Europe for a preplanned visit, appellant and AKH met them at the airport. NH observed that AKH's mannerisms towards appellant were like he was her boyfriend rather than a surrogate father. A day or so later, on a trip to southern Germany, NH confronted AKH and she admitted she and appellant were having an affair. Subsequently, NH confronted appellant and eventually he admitted it. During one exchange, appellant said, "I'm sorry, we just fell in love." When appellant asked NH if there was anything he could do, she informed him AKH would be returning to Colorado with her parents and she asked appellant to obtain AKH's school records.

NH, a woman in her sixties, is not one who discusses sexual matters openly or easily. She conceded she never used sexual terms when she confronted appellant about AKH, but she was adamant that he understood her when she asked him repeatedly, "how could you?" She states she showed appellant one of his own books on the Apostle Paul's Letter to the Romans in which she highlighted a section on adultery. She stated that when appellant read it, he put his head in his hands, started sobbing, and said he was sorry.

Appellant contradicts many of the Government's witnesses, including AKH, but he rarely contradicts NH. He conceded that he apologized for not telling DH and NH that he and his wife were having marital problems, but he described them as no more than any couple might experience at any given time. Appellant denied admitting to an affair with AKH and saying they fell in love. Otherwise, he confirmed the words NH said were exchanged between them, but he insists she misunderstood him and missed his meaning and intent entirely. Seizing on NH's nonuse of sexual terminology, appellant maintains that when NH asked him "how could you?", he interpreted that as her asking how he and AKH could have bonded so closely as father-daughter, effectively supplanting NH and DH. Appellant insists that the only thing he apologized for to NH was supplanting her and DH as parent figures, as he and AKH had bonded so well. His explanation for touching heads while parked in the high school parking lot was that they were praying prior to her entering school for the day.

If appellant's version is believed, the entire episode is one of the largest instances of miscommunication in the annals of history. We do not believe there was any miscommunication. For example, the best appellant can do with regards to the excerpt from the book on Romans is that when NH gave it to him, he laid it aside without reading it, because he was trying so hard to get her to communicate with him. Testifying during the prosecution's rebuttal case, however, NH was emphatic that appellant sat on the bed and read the excerpt, then started sobbing, and said "I'm sorry."

Appellant could not afford to admit that he read the excerpt from the book on Romans, for the overriding theme of the section highlighted is adultery and why it is to be avoided. Appellant also takes issue with AKH's testimony that he tracked her menstrual cycle and practiced *coitus interruptus* when they engaged in sexual intercourse. Appellant's specific rebuttal is his wife's testimony that she did the laundry and surely would have observed any semen stains on the sheets. Appellant, however, overlooks the fact that AKH also testified that she would wash the sheets herself whenever appellant stained them. That, of course, would account for Mrs. Huberty's not observing any stains whenever she did the laundry.

Appellant's character evidence, and his own testimony, cast him as a trusting, al-

truistic person of enormous esteem in the local Christian community with a long history of working with young people, including opening his home to them. His public persona notwithstanding, he admitted he was tempted by AKH, although he insisted he controlled it and never gave in. The evidence proves otherwise. It demonstrates that, by making AKH his legal ward, appellant brought into his family what turned out, for him, to be a piece of kryptonite; and then he failed to use the lead shield of his wife and family and his professed faith to protect him from its lethal rays. As Superman's one vulnerability is kryptonite, appellant's, for whatever reason, was AKH. Appellant's explanation on cross-examination of how he has forgiven AKH and that while he loved her, he was not in love with her vividly demonstrates this fact. When one reads his response of why he is not in love with AKH in light of the entire record, it is abundantly clear, beyond a reasonable doubt, that his love for her is not *agape* love, as he claims, but *eros*.

## IV. DENIAL OF REQUEST FOR A NAMED EXPERT WITNESS

Appellant avers that the military judge committed prejudicial error by not ordering Dr. C's production at government expense. Prior to trial, civilian trial defense counsel requested funding for Dr. C from the convening authority pursuant to R.C.M. 703(d), which the convening authority denied. He renewed the request before the military judge. *Id.* After hearing the proffer, the military judge directed the Government to identify and provide an adequate substitute to serve in the capacity of defense consultant and, if desired, an expert witness. Dr. K, a certified psychiatrist, was made available to the defense for this purpose. This appointment, notwithstanding, civilian trial defense counsel opted to use Dr. C because of his evaluations of appellant and his opinions on the case. After findings, the military judge granted civilian trial defense counsel's request for an Article 39(a), UCMJ, session so that he could attempt to develop a record for after-the-fact funding for Dr. C. Dr. K was called as a witness for this purpose. We find

appellant affirmatively waived any issue by his rejection of Dr. K's assistance.

██ Trial counsel, defense counsel, and the court-martial have equal opportunity to obtain witnesses and other evidence. Article 46, UCMJ, 10 U.S.C. § 846. A military judge's ruling denying production of an expert witness, or an expert witness' expert testimony, is reviewed for an abuse of discretion. *United States v. Ruth,* 46 M.J. 1 (1997). In the instant case, however, the military judge did not deny appellant's request for expert assistance. The problem is that appellant did not want expert assistance, but a specifically named expert and a particular opinion. To this, appellant is not entitled. *United States v. Ndanyi,* 45 M.J. 315 (1996); *Ingham,* 42 M.J. at 226; *United States v. Burnette,* 29 M.J. 473 (C.M.A.1990).

██ An accused does not have the right to compel the government to provide either a particular expert or a particular opinion. *Id.* Dr. K's testimony demonstrated clearly that his qualifications were not the issue. Had qualification been the issue, it was incumbent upon defense counsel to inform the military judge and seek relief. Civilian trial defense counsel and appellant used Dr. C because he had formulated psychological theories which they viewed as more favorable to appellant's case but with which Dr. K disagreed. Civilian trial defense counsel attempted to coin euphemisms to describe this fact but conceded it nonetheless. Having made an affirmative decision not to use Dr. K, appellant cannot now be heard to complain that he had to personally defray the cost of Dr. C's services. Appellant received all to which he was entitled. *See Burnette,* 29 M.J. at 476.

## V. OTHER ASSIGNMENTS OF ERROR

The remaining assignments of error asserted by appellant will be addressed and disposed of summarily. *United States v. Curtis,* 44 M.J. 106, 126 (1996); *United States v. Clifton,* 35 M.J. 79, 81 (C.M.A.1992).

██ A. *Appellant's request for proof from the convening authority that he reviewed appellant's clemency materials, and appellant's request for a new action to afford*

the convening authority opportunity to grant him "additional clemency." This Court rejects the averment that the fact the convening authority signed his action on appellant's case while traveling away from his base and transmitted his action via telefacsimile raises an inference that the convening authority did not consider appellant's clemency submissions. Further, there is no requirement that the convening authority prove to appellant that he did not consider matter from outside the record or other "new matter" where there is no indication in the post-trial submissions that any such matter existed or was considered. Conjecture by defense counsel does not create evidence or any duty to respond on the part of the convening authority.

Appellant's assertion that the convening authority's waiver of the forfeitures when he did not have the authority to do so, *see United States v. Gorski*, 47 M.J. 370 (1997), is proof of a predisposition to grant him clemency is misplaced. The convening authority took his action prior to our superior court's decision in *Gorski*. Thus, the convening authority was not on notice that he was without authority to apply Article 58b to appellant.

B. *Military judge's denial of defense request to admit evidence under Mil.R.Evid. 412.* The military judge allowed civilian trial defense counsel to cross-examine AKH on one of the prior sexual relationships in order to establish a motive to misrepresent via prior inconsistent statements. *See United States v. Stavely*, 33 M.J. 92 (C.M.A.1991). There was no abuse of discretion in the military judge's denying the defense request to question AKH on another relationship on the ground that civilian trial defense counsel did not establish relevancy, in that the proffered evidence was not necessary to establish AKH's prior knowledge of the sexual activities in which she testified she and appellant engaged. *Cf. United States v. Gray*, 40 M.J. 77, 80 (C.M.A.1994) (error to exclude evidence of 9–year–old's sexual activity with one other than the accused to demonstrate she had knowledge beyond her tender years before encounter with accused).

C. *Request for MWR as a defense character witness.* There was no abuse of discretion in the military judge's refusal to order this witness' presence because her testimony would be cumulative to the testimony of other character witnesses which were produced. Mil.R.Evid. 403. Further, almost the entire substance of this witness' testimony was elicited during the direct testimony of another defense character witness. Therefore, even if there were an abuse of discretion, any error was harmless. Article 59(a), UCMJ, 10 U.S.C. § 859(a).

D. *Allowing prosecution witness to testify he did not believe accused.* The witness in question did not testify as to appellant's credibility. The testimony in question was elicited to demonstrate appellant's lack of reaction when a close associate informed him he did not believe his account of what happened at the swimming pool. This was not error. *See* Mil.R.Evid. 103(d); *United States v. Powell*, 49 M.J. 460 (1998).

E. *Military judge's failure to instruct president of court he was not to rely on his personal specialized knowledge.* Our assessment of the record is that Dr. M's questions of Dr. S were well within bounds, and do not reflect that he either became a witness for the prosecution or otherwise injected his medical training into the deliberations of the members. Therefore, the military judge did not err by not instructing Dr. M as civilian trial defense counsel requested. *See United States v. Hill*, 45 M.J. 245, 248–49 (1996); *United States v. Worrell*, 3 M.J. 817 (A.F.C.M.R.1977).

## VI. DECRETAL

The findings are correct in law and fact, and no error prejudicial to the substantial rights of the accused occurred. Accordingly, the findings and sentence are

AFFIRMED.

Judge SCHLEGEL and Judge SENANDER concur.